JOHNNY B. MCKINSTRY *v*. STATE OF INDIANA.

[No. 1074S208. Filed December 11, 1975.]

*Thomas H. Singer,* of South Bend, for appellant.

*Theodore L. Sendak,* Attorney General, *Wesley T. Wilson,* Deputy Attorney General, for appellee.

DEBRULER, J.—Appellant, Johnny B. McKinstry, was indicted for second degree murder, Ind. Code § 35-1-54-1, being Burns § 10-3404. In a trial without jury, before Judge William A. Hosinski, appellant was found guilty of second degree murder. He was sentenced to a term of fifteen to twenty-five years and fined two hundred dollars. After the court denied his motion to correct errors, he appealed on two grounds: (1) the sufficiency of the evidence to support a finding that appellant killed the victim and (2) the sufficiency of the evidence to show that appellant killed the victim "purposely and maliciously."

The evidence supporting the decision of the trier of fact shows that on the afternoon of November 24, 1974, appellant and the victim, Thomas Carter, were both prisoners in the

St. Joseph County Jail. At the time of his death, Carter had been in jail only fifteen hours for hitchhiking. The cellblock which the two shared with about eight other prisoners was divided into one four-man cell and two eight-man cells, all opening out into a common day room. The cell doors were never locked. From the dayroom, one could see into the cells, but the walls prevented one from seeing from one cell into another.

Appellant hung a blanket over the front of his cell, as prisoners sometimes did to keep out the light when they wanted to sleep. Appellant told another prisoner, Giles, that he was going to have a man-to-lady talk with Carter. Giles understood this to refer to sodomy. Prisoner Grady Bobbitt was in appellant's cell with him. Later, Carter came to the cell.

Several prisoners in the two other cells heard a scuffle, and then Carter screamed like someone being tortured. He cried out, "It hurts." Prisoner Rogers went down to appellant's cell because he wanted to share in the sodomy he thought was occurring. In less than a minute, he returned to his cell and told the other prisoners there that he wanted no part of that.

Another prisoner, Palicki, hearing the commotion and hearing Carter scream for help, went out into the catwalk and looked into the cell. Appellant was holding Carter in a headlock, and Bobbitt was standing close behind Carter. Carter's buttocks were bare. Carter was yelling for the guard and screamed, "God help me. They are killing me." No one else was in the cell, and none of the prisoners who looked in tried to help Carter. Prisoner Miller witnessed the same scene: Only appellant, Bobbitt, and Carter were in the cell. Carter was bent over at the waist, and appellant had him in a headlock and was pulling up on his right arm. Bobbitt was standing at Carter's right, as if he were going to commit sodomy. Carter's clothes were down to his waist and ripped.

When the guard came in, prisoner Flynn turned the volume up on the radio. The guard asked for the blanket to be taken

down. Prisoner Davis finally took it down, and Bobbitt came walking out. Appellant was lying in a lower bunk with his face to the wall. Carter was lying on the floor. Davis started to pat his face, thinking he might have fainted. He made one gasping sound and died. About three seconds after Davis entered the cell, appellant got up, yawned, and asked what was going on.

A half hour after Carter's death, appellant and four other prisoners were talking. Appellant told Bobbitt that, if push came to shove, he could take it all on himself and leave Bobbitt out of it. He also said that if anyone told on him, that [they should remember] they were going to prison with him and that those who were not going to prison, his family would take care of for him. He said that everyone should just be quiet, because they could not prove anything and people die in jail every day.

The medical testimony showed that the victim, Thomas Carter, died of asphyxiation due to strangling, throttling, and smothering. It was physically impossible for his death to have been suicide. His death would not have resulted from strangulation by an arm alone, but required the throttling, that is, holding the throat by the hand by force, thereby obstructing the air passages, and ultimately resulting in a fracture of the cornu of the thyroid cartilage.

The medical testimony was important evidence of the types of acts and the degree of force necessary to cause Carter's death. The doctor was asked: "Could this death have been caused by strangulation with a human arm?" He replied: "Not as such. . . . I found a strangulation mark . . . consistent with the application of force used by an arm, possibly, but to say it is the cause of death, I would say I doubt it."

The doctor was asked to give an opinion about the force which caused the injuries. He replied:

"To have this wound, there may be blows to the neck and holding the throat by the hand, and because the cornu of

the thyroid cartilage is not in a horizontal line with the surface of the body,—it is deeper, it is in a deep level—so it could not be fractured unless it was caught by the hand or the force extended, force applied to it so excessive, and the body was supported from behind, that this cornu hit the vertebral column in the back or spine in order to be fractured. So there was excessive force applied in this area. The bruise, the cuts, the ones in the lips, also external violence, the lips have hit the edges of the teeth in the regular way, so it has been a result of these wounds that occurred."

On cross-examination, the defense asked: "You said you didn't think it was possible, this strangulation or throttling, as you called it, with an arm around the neck?" The doctor's reply indicated that the headlock could not have caused the throttling. "It is the throttling cannot be by the arm."

The defense asked also about the force which would cause the fracture.

"Q. Could the fracture of that cartilage you have talked about occur with the fall of the neck against a sharp object or cell bunk?

A. My answer could be no.

Q. It could not occur?

A. It cannot occur. I have to have some other evidence with it in order to say that.

Q. Not possible to occur in a fall?

A. Just a fall that causes fracture to this particular bone per se, I would say no.

\* \* \*

A. [T]he structure of the bone itself is very, very important. And so this bone is malleable, its structure does not allow it to fracture from minor injuries by a fall, either on a blunt or a sharp object. You will have certain type of wounds in the neck and, if I have a fracture of that bone, it will give me a certain pattern. We have special pattern for each type of injury. So my answer would be no, sir.

\* \* \*

Q. We have got a man that you said weighed about 190 pounds, and if he fell and hit his neck against a blunt object, isn't it possible, Doctor, that he could have fractured this cartilage?

A. Still my answer would be no. That's my best judgment."

This evidence would support the court's finding that appellant killed Carter. Carter entered the cell where appellant and Bobbitt were. No one else entered after Carter, and Carter died of wounds, which were not self-inflicted, within five minutes of his entering the cell and screaming for help. Two prisoners saw appellant holding Carter in a headlock and wrestling with him. Both testified that, while they watched, Bobbitt only stood near Carter ready to commit sodomy. A minute or two later, Carter was lying on the floor dead from asphyxiation due to strangling and throttling. Although the doctor testified that a human arm alone could not have caused Carter's death, the trier of fact could have inferred appellant's throttling Carter with his hand as he was holding him in a headlock or after he had released the headlock. It is not necessary that there be an eyewitness to a crime. The trier of fact is permitted to infer the guilt of the accused from circumstantial evidence.

The second issue presented is whether the State proved beyond a reasonable doubt that appellant killed Carter "purposely and maliciously." Second degree murder is defined by statute as follows:

"Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree. . . ." Ind. Code § 35-1-54-1, being Burns § 10-3404.

By the terms of this statute, the infliction of a fatal injury upon a human being is not murder unless done "purposely and maliciously." These terms describe the state of mind which must be shown to exist at the time of the infliction of the fatal injury. Direct statements of an assailant, circumstances in which the killing took place, and the method of killing are common types of evidence which tend to establish state of mind. Compare *Brown* v. *U.S.,*

(1859) 159 U.S. 100, 16 S.Ct. 29, 40 L.Ed. 90. An act is done purposely, if it is willed, is the product of a conscious design, intent or plan that it be done, and is done with an awareness of probable consequences. *Fahnestock* v. *State*, (1864) 23 Ind. 231, 262. *See also, Model Penal Code* § 2.02 (2) (a) (Proposed Official Draft, 1962).[1] However, if one carries out a plan to inflict injury with an awareness that death will probably result, and death does result, that conduct can be murder, manslaughter, or no crime at all, depending upon whether the additional element of malice is also present. R. M. Perkins, A Re-Examination of Malice Aforethought, 43 *Yale L.J.* 537, 539 (1934).

On the one hand, malice may be defined in a positive fashion. Blackstone defined malice, which even then distinguished murder from other homicides, as "any evil design in general; the dictate of a wicked, depraved and malignant heart." 4 W. Blackstone, *Commentaries* * 198. Several Indiana cases have adopted versions of this definition: *Blackburn* v. *State*, (1973) 260 Ind. 5, 291 N.E.2d 686; *Helms* v. *State*, (1968) 251 Ind. 335, 241 N.E.2d 244; *Brown* v. *State*, (1934) 206 Ind. 223, 189 N.E. 133; *Harris* v. *State*, (1900) 155 Ind. 265, 58 N.E. 75; *Davidson* v. *State*, (1893) 135 Ind. 254, 34 N.E. 972.

On the other hand, malice may also be defined in a negative fashion. It is that state of mind which exists when one purposely kills another not in the heat of passion induced by sufficient provocation, *e.g. Williams* v. *State*, (1925) 196 Ind. 84, 93, 147 N.E. 153, not excused, as when acting in self-defense, *e.g. Taylor* v. *State*, (1929) 201 Ind. 241, 167 N.E. 133, and not justified, as when killing in military combat. R. M. Perkins, A Rationale of Mens Rea,

---

1. "A person acts purposely with respect to a material element of an offense when:

    (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

    (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist."

52 *Harv. L. Rev.* 905, 915-17 (1939) ; R. M. Perkins, A Re-Examination of Malice Aforethought, 43 *Yale L.J.* 537, 567-70 (1934) ; 4 W. Blackstone, *Commentaries* * 201.

In this case, the State produced evidence from which a reasonable trier of fact might find beyond a reasonable doubt that the appellant possessed the state of mind required for conviction of second degree murder. This homicide occurred when appellant hung up a blanket to obscure the view into his cell and waited for Carter to come in, so that appellant and Bobbitt could forcibly commit sodomy. After a "scuffle" or "small fight," appellant grabbed and put a headlock on Carter and pulled up on his arm, so that Carter could not resist, although he was a strong man. And Bobbitt also was present. At this point, there is no evidence that appellant was aware that the consequences of his tight grip might be to kill Carter. However, next Carter screamed. A minute or two later, he screamed again for the guard and for help. Minutes later he was lying on the floor dead. The medical cause of death was asphyxiation due to strangling, throttling, and smothering.

The trier of fact could reasonably infer beyond a reasonable doubt that when confronted with screaming and resistance from the victim, appellant chose to persist for several minutes in throttling the victim and to apply such force to the victim's throat as would be necessary to render the victim incapable of resistance or escape, even to the point of fracturing a bone in the throat and cutting off life-giving air. Such an act of deliberate immobilization, great force to the neck and throat over a period of several minutes, after Carter had screamed for help twice, would support a finding that appellant carried out a plan to forcibly hold the victim in a grip about the throat, and that, in doing so, he became aware that death would probably result from applying such force to the victim's throat. This evidence is sufficient to support the trial court's finding that this killing resulted from the purposeful act of appellant.

This evidence also leaves no doubt of appellant's malice. Appellant and Bobbitt killed Carter after they committed or attempted to commit forced sodomy. Appellant continued to keep Carter in a headlock after he twice screamed for help. Carter's lips were cut by his teeth because of a strong blow to his mouth. And, he was killed by strangulation and a violent choking. Carter did not provoke the attack, nor was the strangulation done in self-defense.

The trial court did not err in finding appellant guilty of second degree murder. We affirm the judgment.

Givan, C.J., Arterburn, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 338 N.E.2d 636.