**Michelle L. BOYKING, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 17889.**

Supreme Court of Indiana.

Feb. 20, 1979.

Anthony V. Luber, South Bend, for appellant.

Theo. L. Sendak, Atty. Gen., Wesley T. Wilson, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant, Michelle L. Boyking, was tried by jury and found guilty of second degree murder. Ind.Code § 35–13–4–1 (Burns 1975). She received a life sentence. On appeal she presents two issues:

(1) whether the evidence of the elements of purpose and malice was sufficient; and

(2) whether the evidence negating her claim of self-defense was sufficient.

Appellant, a woman, twenty-four years of age, admitted in a statement to police that she shot and killed Jimmy Glaspie in the early morning hours of January 27, 1977, while the two were seated in his car in a park in South Bend. After the jury returned its verdict of guilty of second degree murder, and on the day set for sentencing, appellant filed a motion for judgment on the evidence. The trial court set the motion for hearing nine days hence. Following the hearing on the motion, the court immediately took it under advisement and overruled it four days thereafter. Appellant includes within her claim that the evidence was insufficient to convict the question whether the trial court dealt with the motion as required by Ind.R.Tr.P. 50. The rule does not require the trial judge to specify reasons for denying a motion for judgment on the evidence made between verdict and sentencing, or to relate the supporting and opposing evidence in the case in disposing of the motion. We find that the trial court's treatment was in accordance with the rule and that he determined that the evidence presented at trial was not insufficient to support the jury's verdict of guilty of second degree murder.

Appellant now on appeal challenges the sufficiency of the evidence of purpose and malice, both necessary elements of the offense of second degree murder, and

whether the evidence was sufficient to negate the claim of self-defense. This Court has described the element of purpose in the following manner:

"An act is done purposely, if it is willed, is the product of a conscious design, intent or plan that it be done, and is done with an awareness of probable consequences." *McKinstry v. State* (1975), 264 Ind. 29, 35, 338 N.E.2d 636, 640.

Malice has been defined thus:

"An act is done with malice when it is done with 'any evil design in general.' In homicide, a purposeful killing is done with malice if it is done neither in self-defense nor in the heat of passion induced by sufficient provocation. *McKinstry v. State, supra,* 264 Ind. 29, 338 N.E.2d 636 at 640, and cases therein." *Shackleford v. State* (1976), 264 Ind. 698, 703, 349 N.E.2d 150, 154.

The test to be applied in deciding whether the State has sustained its burden of negating self-defense was stated in *White v. State* (1976), 265 Ind. 32, 349 N.E.2d 156:

"When we review a self-defense claim, we determine if there is any substantial evidence of probative value from which the jury could have determined beyond a reasonable doubt, that appellant did not act in self-defense. Appellant must have acted without fault, been in a place where he had a right to be, and been in real danger of death or great bodily harm, or in such apparent danger as caused him in good faith to fear death or great bodily harm. The State has the burden of showing that appellant did not meet one of these requirements." 265 Ind. at 34–35, 349 N.E.2d at 158.

In determining such sufficiency issues, we do not weigh the evidence nor resolve questions of credibility but look to the evidence and reasonable inferences therefrom which support the verdict. In so doing we may consider evidence supporting the verdict without regard to which side produced it. *Mitchell v. State* (1977), Ind., 366 N.E.2d 183. The conviction will be affirmed if from that viewpoint there is evidence of probative value from which a reasonable trier of fact could infer that appellant was guilty beyond a reasonable doubt.

■ It was developed at trial that appellant was seated next to Glaspie in the front seat of the car. She took the weapon from under the seat where she had placed it. She knew that the gun was loaded. She fired the weapon at least two times at him and on each occasion a slug from the gun entered his head on the right side and exited on the left side. From these facts the jury could reasonably have concluded beyond a reasonable doubt that appellant formed the plan and intent to take the life of Glaspie and deliberately did so. There was sufficient evidence of the element of purpose.

Further evidence showed that appellant had been acquainted with Glaspie for a year and had known him as one who had shared a house with a friend of hers during 1976. She had talked with Glaspie at her mother's house during a party at least once, and Glaspie had spoken to her in a manner so as to show his sexual interest in her. Late on the night of January 26th, she was in the home of her grandfather with whom she was residing and telephoned her mother. The appellant told her mother that she was coming over for a visit and would bring some beer and drinks. The appellant then telephoned a male friend whom she had formerly dated and asked him to drive her to her mother's house. He declined and she then spoke during the same call with Glaspie who agreed to make the trip. She then took her grandfather's .38 caliber handgun from its hiding place in the house, and stuck it in the waist of her pants. As previously arranged Glaspie picked her up between 11:00 p.m. and midnight. As she got in the car she slipped the pistol under the car seat. He already had beer and whiskey in his car. Within a few minutes after she got in the car he gave her a six pack of beer and she, seeing his drinking, opened a can of beer for herself. He then drove to a gas station where he filled a water container which he kept in the car. He used the water to mix drinks with while in the car. The trip continued until they reached a park where

Glaspie pulled in and stopped. At the time it was snowing hard. Appellant did not voice any objection to his stopping the car. The two continued drinking, the radio was playing, and at least once, both exited the car to relieve themselves. He made sexual advances toward her which she rebuked, and pulled away. At no point during the entire encounter did he attempt to take off her clothes or his own nor threaten verbally to hurt her if she did not submit to his advances. Glaspie then took her by the arms and attempted to pull her to him. She then told him that she was not interested and that he should take her to her mother's. He responded that he did not want to do that and told her that she owed him her body since he had provided her with the beer. It was at this point, upon hearing these words and upon his attempt to embrace her again, that appellant reached down under the seat, took the gun in hand and shot Glaspie through the head. She then took six dollars from his pants pocket, and in panic shoved his body from the car and drove it about 100 feet where it got stuck in the snow. She then ran on foot from the car and returned to her grandfather's house where she reloaded the gun and returned it to its usual location.

In both her written statement and in-court testimony, appellant described Glaspie's statement to her that she owed him her body in return for the beer as the event which immediately preceded her decision to take the gun in hand and shoot him. *In court* she testified that Glaspie's conduct was "lovey-dovey" and trying to "feel on me." Under close questioning by defense counsel appellant stated that she thought he was going to attack her for sex. She also testified that she had been "snatched" and raped in 1974 in Cleveland and that she carried the pistol for protection. *In her written statement* by contrast appellant gave the following answers describing Glaspie's conduct immediately before the shooting and her response to it:

"Q. Did Jimmy threaten to harm you in any way if you didn't go along with him what he wanted to do?

A. He said lets fuck and he grabbed me cause he figured I owed him.

Q. Were you afraid for your life?

A. No, but I didn't want him to feel that I owed him my body for buying me some beer."

In reference to being afraid, on cross-examination during her trial testimony the prosecutor asked:

"Q. Isn't it true that you weren't worried because you had that gun?

A. I wasn't worried about anything."

The apparent conflict in these versions of the events with regard to appellant's state of mind was, in the final analysis, for the jury to resolve. We find upon this appeal that appellant's version as related in her written statement, when taken together will all of the other testimony describing the acts of appellant, including finally that she had the presence of mind to take money from Glaspie's pocket after having shot him, constituted evidence from which the trier of fact could have concluded beyond a reasonable doubt that appellant did shoot Glaspie with malice upon merely being irritated by his verbal suggestion that he had purchased her cooperation with the present he had given her. Such body of evidence likewise satisfied the burden of the State to prove that appellant did not shoot Glaspie in self-defense in that from it the jury could have concluded beyond a reasonable doubt that on such occasion appellant was not in danger of and did not fear death, rape or other great bodily harm at all.

The conviction is affirmed.

GIVAN, C. J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.