Roger C. DROLLINGER, Appellant,

v.

STATE of Indiana, Appellee.

No. 778S146.

Supreme Court of Indiana.

Aug. 26, 1980.

Michael T. Conway, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Philip R. Blowers, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Appellant Roger C. Drollinger was charged in Parke Circuit Court with four counts of first degree murder, Ind.Code § 35–13–4–1 (Burns 1975). The charges arose out of the February 14, 1977 shotgun slayings of Gregory Brooks, Ralph Spencer, Raymond Spencer and Reeve Spencer in their mobile home near Hollandsburg, Indiana. Daniel Stonebraker, Michael Wright and David Smith were also charged in connection with these crimes. After a change of venue to the Blackford Circuit Court, appellant Drollinger was tried separately to a jury. He was convicted on all four counts, and was sentenced by the trial court to four life sentences, to be served concurrently.

Appellant presents eleven issues for our consideration on this appeal. These issues concern: (1) whether the trial court erred in denying appellant's motions for continuances; (2) whether the trial court should have granted a second change of venue or, alternatively, a continuance, due to pretrial publicity; (3) whether the trial court erred in denying appellant's written request to have the jury sequestered during trial; (4) whether the trial court erred in admitting into evidence certain photographs; (5) whether certain testimony from witness James Lyons should have been admitted into evidence; (6) whether the trial court erred in admitting into evidence State's Exhibit number seventy-seven, a .38 caliber revolver; (7) whether the trial erred in granting the State's motion in limine concerning witness Kevin Rhodes; (8) whether the trial court should have granted a mistrial or admonished the jury as a result of alleged prosecutorial misconduct; (9) whether the trial court erred in refusing two of Drollinger's tendered instructions; (10) whether appellant was denied due process, considering the "totality" of the alleged errors set out above; and (11) whether the evidence is sufficient to sustain the convictions.

I.

Appellant Drollinger first argues the trial court erred in denying his motions for continuances filed August 23, September 1, and September 6, 1977. He contends the geographical distance between co-counsel and a need for more time to prepare the defense and depose two co-defendants necessitated the requested continuances.

 A motion for continuance based on non-statutory grounds, such as an alleged need to have more time for trial preparation, is addressed to the trial court's discretion. *Hemphill v. State*, (1979) Ind., 387 N.E.2d 1324, 1326; *Minton v. State*, (1978) Ind., 378 N.E.2d 639, 641; *Simpson v. State*, (1978) Ind., 381 N.E.2d 1229, 1233. *See Miller v. State*, (1978) Ind., 372 N.E.2d 1168, 1170–71. *See also Mitchell v. State*, (1979) Ind., 398 N.E.2d 1254, 1256–57. Appellant correctly asserts that a criminal defendant generally has the right to depose prosecution witnesses. *Amaro v. State*, (1968) 251 Ind. 88, 94, 239 N.E.2d 394, 397. Further, the Sixth Amendment's guarantee of the effective assistance of counsel contemplates that such counsel will have an adequate amount of time to prepare to meet the charges against his client. *See Powell v. Alabama*, (1932) 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158; *Baker v. State*, (1967) 248 Ind. 85, 221 N.E.2d 432. The record in this case, however, does not reveal

a denial of the right to the effective assistance of counsel, nor of the right to depose prosecution witnesses.

To properly resolve this issue, we must examine the procedural background against which these motions for continuances were made. The charges in this case were filed on March 9, 1977. Drollinger was arrested approximately one month later, and appeared for arraignment on May 26, 1977. At that time, the court set the case for jury trial on August 30, 1977, and formally appointed attorney Nile Stanton of Indianapolis as pauper counsel for Drollinger. It appears from the record, however, that Stanton had been Drollinger's attorney in this case and had acted on his behalf from the time the charges were filed. On July 5, 1977, Stanton, on behalf of appellant Drollinger, filed a "Motion for Speedy Trial," which consented to the August 30 trial date and purported to raise a continuing objection to the case being continued after August 30. Attorney Stanton also moved the court to appoint co-counsel to assist him. These motions were granted, and on July 14, 1977, the court appointed David Ford of Hartford City as co-counsel. That same day, the trial court received a letter from Stanton, dated July 13, stating that Stanton had a schedule conflict with respect to the August 30 trial date. Stanton advised the court in this letter that he would continue to prepare for Drollinger's August 30 trial, and would contact certain attorneys to discuss Drollinger's case, in anticipation of his having to withdraw as Drollinger's attorney. On July 26, 1977, Stanton filed a verified petition asking for leave to withdraw from the case after the July 29 pretrial conference. This petition stated in part:

2. Counsel has worked closely with Indianapolis attorney Mike Conway on this case, and attorney Conway is prepared, willing and able to promptly take over the role of chief defense counsel in this cause.

(a) I have catalogued, indexed, and cross-indexed all facts in my possession pertaining to this case and am delivering several volumes of such materials, with the indexes, to attorney Conway.

(b) I have met with and discussed this case at length with attorney Conway and have discussed with him all matters pertaining to trial tactics, the facts, legal issues, etc.

(c) I have personally seen attorney Conway's written work and have seen him during trial; and, in my professional opinion, he has expertise in criminal law and can competently and zealously represent [the] defendant in this case.

. . . . .

4. I shall appear and participate in the pretrial conference scheduled for July 29, 1977, as attorney Conway plans to do also; and, thereafter, even after my withdrawal, I shall from time to time assist attorney Conway, where requested by him, at my own expense.

. . . .

Record at 70–71. The trial court granted this petition, and Conway was appointed a Drollinger's co-counsel on July 29. Attorney Ford remained on the case throughout the pretrial and trial proceedings.

At the July 29 pretrial conference, Stanton told the court that the prosecutor had informed him that Drollinger's co-defendants would be testifying at Drollinger's trial. He further indicated that a "substantial delay" might therefore be requested but "if so, that would be made within seven to ten days." This occurred one month before the date set for trial, five weeks before the trial actually began, and three weeks before defense counsel first asked for a continuance. Stanton also informed the court at the pretrial conference that he and Conway had met "at great length" to talk about the case, the nature of the defense, problems to be anticipated, possible motions, to be made or filed, and jury selection considerations. Further, Stanton indicated he had developed for Conway "four volumes of facts of the case which are indexed, cross-indexed as to date, place, event and so on," and would continue to informally assist Conway with the case.

On August 19, 1977, the State filed a supplemental discovery response which included the following:

"That the State now wishes to amend its Answer in that within the past two weeks the State through the attorneys representing Daniel R. Stonebraker, Michael W. Wright and David W. Smith, were advised that in the event any or all of the three defendants agree to appear and testify for and on behalf of the State in the case of State of Indiana vs Roger C. Drollinger, being four charges of First Degree Murder now pending in the Blackford Circuit Court, Hartford City, Indiana, that the State would recommend on their plea of guilty, one First Degree life sentence; one Second Degree life sentence and two Second Degree sentences carrying fifteen to twenty-five years each."

Record at 90. On August 23, the prosecution and defense appeared for a second pretrial conference. At that time, defense counsel filed a motion for continuance. The trial court granted a one week continuance and re-set the trial date for September 6, 1977.

On August 26, defense counsel filed motions for leave of court and notices of his intent to depose Daniel Stonebraker and Michael Wright, two of Drollinger's co-defendants. On September 1, defense counsel requested another continuance. The court indicated to defense counsel at that time that it would not continue the trial, but that it would make every effort to aid in the taking of the requested depositions. Attorney Conway told the court that, if the depositions could not be completed before the trial began, it "would be fine during trial sometime." Record at 229. The record further reflects the following:

"And be it further remembered that afterwards, to-wit: on the 2nd day of September, 1977, the same being the 210th Judicial Day of the 1977 Term, the following proceedings were had in this cause and entered of record in the Civil Order Book No. 68, at page 258, to-wit:

Comes now the Court and contacts Stephen Trueblood, attorney for the co-defendant, Michael Wright, and the Court is now advised by Mr. Trueblood that any proposed depositions that are attempted to be taken, said attempt should be made where the co-defendant is currently incarcerated. The Court now attempts to contact Mr. Donald Gibson, attorney for the co-defendant, Daniel Stonebraker, and Mr. Gibson is out of his office at this time attending a seminar and the Court is advised that Mr. Gibson plans to be in Blackford County on the 6th day of September, 1977, for the commencement of the trial of Roger C. Drollinger.

And be it further remembered that afterwards, to-wit: on the 6th day of September, 1977, the same being the 213th Judicial Day of the 1977 Term, the following proceedings were had in this cause and entered of record in the Civil Order Book No. 68, at page 258, to-wit:

Comes now the Court, and for purposes of the record, now makes entry showing that the Court contacted David C. Ford, co-counsel for the defendant, on the 4th day of September, 1977, and advised David Ford in regard to the docket entries of September 2, 1977.

Comes now Michael Conway and David Ford, attorneys for the defendant, in person and comes now Clelland Hanner, Prosecuting Attorney for Parke County in person and the Court now advises said parties regarding the telephone conversations with the attorneys for the co-defendants [Stonebraker and Wright] in regard to possible depositions, and Michael Conway, attorney for the defendant, after conferring with the Prosecuting Attorney, now advises the Court that they will attempt to take the depositions of the co-defendants if they deem it necessary during the pendency of the trial.

Record at 162–63. The briefs do not indicate whether defense counsel did, in fact, depose Stonebraker and Wright.

█ It is clear, then, that the trial court's refusal to continue the trial longer than one week did not operate to deny Drollinger's attorneys adequate preparation time. Co-counsel David Ford was involved in the case two weeks prior to Conway's formal appointment, and remained on the case until the trial was concluded. Drollinger's first attorney, Nile Stanton, represented to the

trial court when he withdrew that he had fully discussed the details of the case with Conway well in advance of Conway's formal appearance, in anticipation of the latter's participation in the case. Stanton also told the court that Conway was "prepared, willing and able to promptly take over the role of chief defense counsel in this cause." Moreover, the trial began nearly six weeks after Conway's formal appointment to the case. Accepting appellant's contention that the case presented complex factual and legal questions, we do not believe the trial court abused its discretion in refusing to grant additional preparation time. Appellant had initially requested a speedy trial with full knowledge of the complexities of the case. In addition, the geographical distance between co-counsel which appellant complained of was not affected by Nile Stanton's withdrawal from the case, because his replacement, Conway, also kept his offices in Indianapolis. Further, Conway's allegation that the distance between co-counsel and him caused preparation problems was not made until at least four weeks after Conway began participating in the case. We think any preparation problems caused by counsels' offices being in different cities should have been discovered and brought to the court's attention sooner than only one week before the originally scheduled trial date, which, in fact, had been set for three months. Thus, the facts simply do not support counsel's assertion that he had only thirty days to prepare for trial, and that the time he did have was inadequate.

The record likewise does not support counsel's claim that a continuance was necessary so that he might depose Daniel Stonebraker and Michael Wright. As explained above, the trial court took an active part in attempting to facilitate the taking of the depositions prior to trial. Yet, when the court informed counsel of the problems with bringing all parties together before trial, counsel said he would be willing to take the depositions, if he felt they were necessary, during the trial. This was the second time counsel made such a statement. It can hardly be said, then, that the court prevented the taking of these depositions.

Counsel revealed on July 29 his awareness of the prosecutor's plans to call the co-defendants as witnesses, and apparently was officially informed on August 19 of the State's intent to have Stonebraker and Wright testify. Drollinger's demand for a speedy trial evidently was still in effect at this time, and the trial date was still set at August 30. However, counsel did not request a continuance until August 26. Finally, appellant has not shown that he was unable to or, in fact, did not depose Wright and Stonebraker prior to their testimony. Thus, we find no abuse of discretion in the trial court's refusal to grant any additional continuances. *Minton v. State, supra; Simpson v. State, supra. See Mitchell v. State, supra.*

II.

Drollinger next argues the trial court should have granted a change of venue or, alternatively, a continuance, due to pretrial publicity. The murders in question occurred on February 14, 1977. Appellant Drollinger was charged in Parke County on March 9 and apprehended in Indianapolis on April 11. Thereafter, he sought and obtained a change of venue, due to the great amount of publicity and media attention these killings had received. The case was venued to Blackford County, and appellant was arraigned on May 26, 1977. At that time, the trial date of August 30 was chosen. As we noted in Issue I, the trial was later continued until September 6, 1977.

On September 1, five days before the trial actually began, appellant filed a motion for a second change of venue or, alternatively, for a continuance. He argued before the trial court and now before this Court that, after the case was venued out of Parke County, the adverse publicity surrounding the murders, and especially this defendant, created a general feeling of prejudice throughout Blackford County and made the selection of an impartial jury impossible. The trial court held a hearing on this motion, and appellant introduced many exhibits which allegedly reflected the tremendous amount of adverse publicity

this case received in local newspapers. The trial court denied the motion at that time, and indicated he would expect the jury selection process to reveal juror partiality.

■ We acknowledge that this case was highly publicized. "One who is reasonably suspected of murdering [four young men] cannot expect to remain anonymous." *Dobbert v. Florida*, (1977) 432 U.S. 282, 300, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344, 362. However, we cannot presume, merely from the *amount* of pretrial publicity the case generated, that the trial setting was inherently prejudicial, in the absence of evidence of a "trial atmosphere . . . utterly corrupted by press coverage." *Murphy v. Florida*, (1975) 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589, 594. *Cf. Sheppard v. Maxwell*, (1966) 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Irvin v. Dowd*, (1961) 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751.

■ The defendant bears the burden of showing such local prejudice and a corrupted trial atmosphere which should have entitled him to a change of venue. *Murphy v. Florida, supra*; *Irvin v. Dowd, supra.* Appellant Drollinger emphasizes that forty-four of the forty-six prospective jurors stated on voir dire that they had heard of the case. This, however, is not enough from which to conclude that appellant's jury was partial. *Dobbert v. Florida, supra*; *Murphy v. Florida, supra*; *Irvin v. Dowd, supra.* Even a showing that a juror entertained a preconceived opinion as to the defendant's culpability is insufficient:

"Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court'

*Irvin v. Dowd, supra*, 366 U.S. at 717, 81 S.Ct. at 1641, 6 L.Ed.2d at 756. At the

same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' *Id*."

*Murphy v. Florida, supra*, 421 U.S. at 799–800, 95 S.Ct. at 2036, 44 L.Ed.2d at 594–95.

■ Our examination of the transcript of the voir dire proceedings reveals that the trial court excused those veniremen who indicated they had a preconceived opinion as to appellant's guilt. None of the persons who ultimately made up this jury panel stated that they had such an opinion or were unsure if they could render a verdict based solely on the evidence presented at trial. Appellant "has simply shown that the community was made well aware of the charges against him." *Dobbert v. Florida, supra*, 432 U.S. at 303, 97 S.Ct. at 2303, 53 L.Ed.2d at 362. We find no error in the trial court's refusal to grant Drollinger a second change of venue. *Worthington v. State*, (1980) Ind., 405 N.E.2d 913, 915–16; *Williams v. State*, (1979) Ind., 386 N.E.2d 670, 672. *See Barber v. State*, (1979) Ind., 388 N.E.2d 511, 512; *Grooms v. State*, (1978) Ind., 379 N.E.2d 458, 461.

■ In addition, we find no error in the trial court's refusal to continue the trial due to the publicity. Appellant has not convinced us that continuing the trial would have decreased the amount of media attention given to the case or made it less likely that the prospective jurors would hear about the case. Thus, appellant has not shown that he was prejudiced by the lack of a continuance. *Vaughn v. State*, (1978) Ind., 378 N.E.2d 859, 865; *White v. State*, (1975) 263 Ind. 302, 305, 330 N.E.2d 84, 96.

Before leaving this issue, we note that Drollinger and his first attorney, Nile Stanton, must take at least part of the credit for the amount of pretrial publicity this case received. As we explained in Issue I, Drollinger was not apprehended until approximately one month after the charges were filed. Prior to that time, a federal fugitive warrant had been issued for Drollinger's

arrest. By misleading the Federal Bureau of Investigation as to Drollinger's whereabouts and his knowledge of Drollinger's flight to avoid and then delay his arrest, counsel was able to successfully orchestrate and conduct a televised press conference which took place immediately prior to Drollinger's arrest. Supposedly, the purpose of attracting this publicity was to protect Drollinger against threats allegedly made on his life. This claim overlooks the fact that Drollinger and his attorney went further than merely arranging for his arrest to be highly publicized. Drollinger, in fact, answered questions from and discussed the case in front of the news media. Record at 1835–79. Thus, appellant purposely attracted even greater public attention to an already highly publicized case, and, in that manner, encouraged future media attention to the case and to him personally. *See Vaughn v. State, supra.*

### III.

On August 23, 1977, appellant Drollinger filed a motion to sequester the jury during trial. Appellant asserted as grounds for this motion that the extensive pretrial publicity and anticipated trial publicity greatly increased the risk of juror exposure to extraneous pressures and information. The trial court refused to sequester the jury, indicating at the hearing on this motion that he planned to thoroughly admonish the jury each time the jury left the room and to question them upon their return as to whether they had been exposed to any outside information or approached by anyone concerning the case.

 The decision on whether to sequester the jury during trial is committed to the trial court's discretion, and is subject to review only for an abuse of that discretion. *Roberts v. State,* (1978) 268 Ind. 127, 131, 373 N.E.2d 1103, 1106; *Kincaid v. State,* (1976) 265 Ind. 345, 350, 354 N.E.2d 199, 203, *cert. denied,* (1977) 430 U.S. 972, 97 S.Ct. 1660, 52 L.Ed.2d 365. *See Owen v. State,* (1978) Ind., 381 N.E.2d 1235, 1240; *Vaughn v. State,* (1978) Ind., 378 N.E.2d 859, 865. At the hearing on the motion to correct errors, appellant introduced several exhibits which reflected the great amount of atten-

tion given to the trial by newspapers and radio and television stations serving Blackford and surrounding counties. Appellant also presented evidence which purported to show that there were several opportunities for juror-spectator contact during the trial.

 For purposes of resolving this issue, we accept as true appellant's claim that his trial drew many spectators and received extensive press coverage from local and state media. However, these facts alone do not show an abuse of discretion by the trial court for failing to sequester the jury. Appellant has not shown that any jurors were actually exposed to the publicity or any other extraneous influences during the trial. His conclusion that the jury was improperly influenced because it was exposed to the mere possibility of contact with outside influences or to any allegedly prejudicial publicity is speculative at best. In fact, it appears from the record that the trial court wisely took special care to guard against the jury's exposure to extraneous influences and to determine if any such exposure had occurred. On each occasion when the court recessed, the court instructed the jury in the following manner:

"You have been selected as jurors and have taken an oath to well and truly try this case. It may take several days for you to hear all of the evidence and the arguments of counsel.

During the progress of the trial, there will be periods of time during which you will be allowed to leave the Court Room, such as recesses for rest periods, for lunch periods, and overnight. During the periods of time that you are outside the Court Room, you must not talk about this case among yourselves or with anyone else.

During the trial, do not talk to any of the parties, their attorneys, or any of the witnesses. If any attempt is made by anyone to talk to you concerning the matters here under consideration, you should report the fact to the court immediately.

There may be publicity in newspapers, on radio, or on television concerning this trial. You must not read or listen to these accounts, but should confine your

attention to the Court proceedings, listening attentively to the evidence as it comes from the witnesses and reach a verdict solely upon what you hear and see in this Court.

You should keep an open mind. You should not form or express an opinion during the trial and should reach no conclusion in this cause until you have heard all of the evidence, the arguments of counsel, and the final instructions as to the law which will be given to you by the Court.

You are further ordered not to read any news articles regarding the case now before you and furthermore you are directed not to watch or listen to any news broadcasts on either radio or television. Also, you are not to discuss this case among yourselves or with any other person or persons. Neither are you to permit any other person to communicate with you concerning this trial. This includes members of your own immediate families. When the Court reconvenes after each recess, each of you will be specifically asked if you have complied with the directions of the Court."

Record at 264–65. Then, after each recess, the court engaged in this colloquy with the jurors:

"1. Have you read any news articles concerning this case?

2. Have you listened to or seen any news articles about this case on radio or television?

3. Have you discussed this case with anyone?

4. Have you permitted anyone to discuss this case with you?

5. Has anybody persisted in attempting to discuss this case with you?"

[The court then directed this group of questions to each juror, and obtained the appropriate negative responses each time.]

Record at 265. Absent a showing of some prejudice, we believe this procedure adequately protected Drollinger's right to an impartial jury free from extraneous and improper influences or pressure. For all of these reasons, we hold the trial court did not abuse its discretion by refusing to sequester the jury during trial. *Roberts v. State, supra. See Bruce v. State,* (1978) 268 Ind. 180, 217–20, 375 N.E.2d 1042, 1063–64.

### IV.

Drollinger next alleges the trial court erred in admitting into evidence several State's exhibits. These exhibits were eleven photographs of the crime scene and the victims. Appellant argues these photographs were repetitious, cumulative and gruesome in character. He claims the photographs served only to inflame the minds of the jurors.

 When photographs are demonstrative of testimony being presented by a witness, they are generally admissible. "Although the photographs may depict gory, revolting or inflammatory details of the crime when presented to the jury, this is not a sufficient basis for excluding such evidence." *Wilson v. State,* (1978) 268 Ind. 112, 116, 374 N.E.2d 45, 48. The relevancy of the photographs may be determined by inquiry as to whether a witness would be permitted to describe verbally the objects photographed. *Chambers v. State,* (1979) Ind., 392 N.E.2d 1156, 1160; *Porter v. State,* (1979) Ind., 391 N.E.2d 801, 813; *Grooms v. State,* (1978) Ind., 379 N.E.2d 458, 463; *Wilson v. State, supra* ; *Murphy v. State,* (1977) 267 Ind. 184, 195, 369 N.E.2d 411, 416.

 We are dealing here with a case in which four young men were killed, each by shotgun blasts to the back of the head, inflicted at close range; obviously, the challenged photographs are gruesome. Three of the pictures show, from different angles, the living room of the mobile home and the victims lying face down on the floor, as they were discovered by police. These photographs were relevant to show the crime scene, the positions of the victims and the lone survivor, and the positions of the gunmen. *Chambers v. State, supra* ; *Wilson v. State, supra.* Four of the photographs depict the faces of each of the victims. These photographs were probative of the identity of the victims and, to some degree, the nature and extent of their wounds. *See*

*Chambers v. State, supra.* The last four challenged photographs were taken during the autopsies of the four victims, and depict, in greater detail, the victims' wounds. The photographs were illustrative of the pathologist's testimony and tend to show the nature and extent of the wounds and to prove the cause of death. They were, therefore, properly admitted. *Grooms v. State, supra*; *Murphy v. State, supra.* *Cf. Kiefer v. State*, (1958) 239 Ind. 103, 153 N.E.2d 899. Because these pictures depicted different aspects of the case, they were not repetitious or cumulative. We find no abuse of discretion in the admission of these photographs. *Wilson v. State, supra.*

### V.

Appellant contends the trial court erroneously admitted certain testimony from witness James Lyons. Drollinger claims this testimony related events which were highly prejudicial to him and were not related to the charged crimes. Witness Lyons testified that he saw Drollinger at a laundromat in Waynetown, Indiana, on February 13, 1977, less than twelve hours before these killings were committed. Drollinger was with his wife and all three of his co-defendants. Lyons testified that he began to converse with Drollinger. He said Drollinger began waving a .38 caliber pistol in front of him, repeatedly pulling back the hammer and threatening Lyons, saying he ought to shoot him. No apparent reason was given by Lyons for this behavior. Appellant now argues this incident was not relevant to the charged crimes and involved a weapon which was not the type allegedly used in the murders.

 We think this testimony was properly admitted. The incident occurred within hours of the commission of the murders, and began a continuing course of violent conduct by Drollinger which culminated in the Spencer home several hours later. *See* Issue XI, *infra.* This testimony also corroborated other aspects of the State's case, including the murderous bent of Drollinger's mind. Further, other witnesses testified that Drollinger was carrying this weapon when the murders were committed. The court did not err in admitting this testimo-

ny. *See McCabe v. State*, (1979) Ind., 396 N.E.2d 895, 897–98. *See generally Riggenbach v. State*, (1979) Ind., 397 N.E.2d 953, 955; *Hill v. State*, (1979) Ind., 394 N.E.2d 132, 134; *Wilson v. State*, (1978) 268 Ind. 112, 116, 374 N.E.2d 45, 47.

The second incident which Lyons related occurred approximately twelve hours after the killings. The murders were committed in the early morning hours of Monday, February 14. In the previous week, Drollinger had been on trial in Montgomery County on certain unrelated drug charges. This trial resumed on Monday, the 14th. At the noon recess that day, Drollinger met with Lyons in a restaurant. Lyons testified: "Roger asked me if I wanted a job and I asked him what it involved and he said 'everything including murder.'" Record at 1217. Appellant objected and moved to strike this testimony, arguing that it was irrelevant and unduly prejudicial.

 We agree that this testimony was irrelevant and should not have been admitted. The incident took place after the murders in question and bore little or no relation to them. The prosecution did not show that Drollinger was contemplating, by this offer of employment to Lyons, any activity which was related in any way to these four killings. However, this error does not require a reversal in this case. There was overwhelming direct evidence of Drollinger's guilt. This evidence will be discussed in Issue XI, *infra.* We do not believe Lyons' testimony could have had anything but the slightest and most remote impact on the jury's consideration of his guilt or innocence. Appellant cannot show any real prejudice from the court's improper admission of this portion of Lyons' testimony. *See Flewallen v. State*, (1978) 267 Ind. 90, 95, 368 N.E.2d 239, 242.

### VI.

Appellant Drollinger also argues the court improperly admitted State's Exhibit number seventy-seven. This article was the .38 caliber pistol mentioned in witness Lyons' testimony, which we discussed in Issue V, *supra.* Appellant presents the

identical argument against the admission of this exhibit that he presented concerning Lyons' testimony. He contends this weapon was not the type of firearm alleged to have been used in the killings.

██ Several witnesses identified this weapon as the one Drollinger carried the day before the killings. Witnesses also testified as to Drollinger's use of the pistol beforehand and his possession of the weapon during the commission of these murders. Michael Wright testified that, during the search of the Spencer home immediately prior to the killings, Drollinger drew the revolver and told Wright he had better help kill the victims, "or else." The trial court did not admit this exhibit into evidence until the prosecution showed that it was the same weapon Drollinger carried during the killings. While there was apparently no evidence that this weapon was actually fired during the murders, the weapon nevertheless clearly tends to connect Drollinger with the charged crimes. *Riggenbach v. State, supra*; *Hill v. State, supra*; *Wilson v. State, supra*. Therefore, State's Exhibit number seventy-seven was properly admitted into evidence.

### VII.

Appellant next contends the trial court erred when it granted the State's motion in limine. This motion concerned defense counsel's cross-examination of witness Kevin Rhodes. The prosecutor requested that counsel be instructed not to attempt to impeach Rhodes by asking questions concerning Rhodes' "drug involvement" and/or any of his convictions for drug-related offenses. The basis for this motion was, of course, this Court's holding in *Ashton v. Anderson*, (1972) 258 Ind. 51, 279 N.E.2d 210. The trial court granted this motion insofar as it applied to Rhodes' convictions, and appellant concedes that convictions for drug-related offenses are outside the scope of *Ashton v. Anderson*.

██ We noted in *Adler v. State*, (1967) 248 Ind. 193, 197, 225 N.E.2d 171, 173: "It is important that the jury have all the circumstances and facts affecting the credibility of the witness in order to properly evaluate the testimony of such witness."

Thus, "all evidence relating to bribery, threats and other influences which affect the credibility of a witness and the weight to be given to the testimony of a witness should certainly go before the jury." *Barnes v. State*, (1978) Ind., 378 N.E.2d 839, 844, *quoting Adler v. State, supra*. *See Bewley v. State*, (1966) 247 Ind. 652, 220 N.E.2d 612. Appellant Drollinger now claims, however, that he was prohibited from cross-examining Rhodes as to whether he had entered into negotiations with the State concerning any pending charges in exchange for his testimony against Drollinger.

██ The record, in fact, reveals just exactly the opposite situation. In the argument on the prosecutor's motion, defense counsel claimed he had a right to show that Rhodes had entered into negotiations concerning pending charges. The court responded: "You can ask him the specific question if anything is pending. In his testimony here today, there's no objection to that question being asked as such." Counsel replied: "That's all I was interested in." Record at 941. Thus, the court specifically stated that it would permit cross-examination regarding possible pending charges. The State's motion did not prohibit cross-examination regarding inducements or offers of leniency in exchange for Rhodes' testimony. Moreover, appellant has not shown by competent evidence that any charges were pending against Rhodes or that any negotiations had been conducted. Finally, appellant has not shown that he unsuccessfully attempted to cross-examination Rhodes on these matters, assuming pending charges did exist. This issue is without merit.

### VIII.

Appellant Drollinger argues the trial court erroneously denied his motion for a mistrial or to admonish the jury, due to alleged prosecutorial misconduct. Drollinger testified on his own behalf. On cross-examination, the following exchange occurred:

"Q. Did you ever read a book entitled, "In Cold Blood?"

A. What?

Q. Did you ever read a book entitled, "[In] Cold Blood?"

A. Cold Blood, not that I recall.

Q. Do you recall being confined to the Crawfordsville Jail?

A. Yes, I was confined at Crawfordsville.

Q. Do you remember reading that book there while you were confined?

A. While I was in the Crawfordsville jail, I don't believe I read very many books at all except for magazines, most of the time I played cards, spades and things of that nature. By the way, I'm a western reader (inaudible). . . .

Q. I'm talking about when you were confined in the Crawfordsville jail in August of 1976?

A. I hardly did any reading at all.

*Michael Conway*: Your honor, if this is pursued any further, defendant is moving for a mistrial.

*Clelland Hanner*: He's already denied it so I'm going to prove it.

*Michael Conway*: Your honor, let the record reflect that if this pursues any farther, defendant's moving for a mistrial.

*The Court*: On what basis?

*Michael Conway*: That the only purpose of bringing in the book, "In Cold Blood," is to inflame that jury.

(Further discussion inaudible.)

Q. I am going to hand you State's Exhibit # 103 and ask you to examine that.

*Michael Conway*: Your honor, for the record, defendant is moving for a mistrial. This is absurd. The prosecutor is only trying to inflame the jury bringing out a prior case about something else.

*The Court*: I'll overrule the motion at this time.

Q. Did you ever see that before?

A. No, I have not.

Q. I am not saying whether you read it or not. Have you ever seen it before while you were in the jail there?

A. I have never seen that book or a copy of that book in my life."

Record at 1826–28. State's Exhibit number 103 was evidently a copy of the book, "In Cold Blood." We note that the record presented to us does not indicate that appellant requested at any time that the questions and answers be struck or that the jury be admonished in any fashion.

First, we are not prepared to say that these actions by the prosecutor constituted misconduct. From the way the questions were phrased and from the comment made at the bench, it appears the prosecutor had some reason to believe, and was attempting to elicit from Drollinger, that he had, in fact, read this book. Drollinger's negative answer and the prosecutor's failure subsequently to offer evidence to the contrary do not necessarily justify a finding of misconduct.

Second, even if we were to conclude that the prosecutor engaged in misconduct, we do not believe appellant was thereby entitled to a mistrial. This was the only occasion on which the prosecutor mentioned this book. Thus, we are concerned with only one isolated instance of questioned behavior, not "repeated instances [which] evidence a deliberate attempt to improperly prejudice the defendant." *Maldonado v. State*, (1976) 265 Ind. 492, 499, 355 N.E.2d 843, 845. The prosecutor did not attempt to discuss the contents of the book or any alleged parallels between the book and the facts of this case. In addition, Drollinger categorically denied ever having seen or read the book. Thus, we cannot say that this incident had any sort of persuasive effect on the jury's decision. In the face of overwhelming direct evidence of Drollinger's guilt, we are unwilling to say that this incident placed him "in a position of grave peril to which [he] should not have been subjected." *Rock v. State*, (1979) Ind., 388 N.E.2d 533, 536; *Maldonado v. State, supra; White v. State*, (1971) 257 Ind. 64, 78, 272 N.E.2d 312, 320. The decision to grant or deny a mistrial lies in the sound discretion

of the trial court, and is reviewed only in terms of whether that discretion has been abused. *Bradberry v. State,* (1977) 266 Ind. 530, 537, 364 N.E.2d 1183, 1187; *Downs v. State,* (1977) 267 Ind. 342, 345, 369 N.E.2d 1079, 1080. We hold the trial court did not abuse its discretion in this case.

### IX.

■ Appellant Drollinger next alleges the trial court should have given two of his tendered instructions. These instructions read as follows:

"The law in Indiana is that an accomplice who turns 'State's evidence' and agrees to cooperate with the State in consideration of leniency or the dismissal of charges, to be realistic, is being bribed regardless of [the] fact that public policy has approved such action in the interest of effective law enforcement and therefore, such accomplice's testimony, though not necessarily false, is highly suspect.

The law in Indiana is that because human nature would tend to cause accomplices to 'unload' against their partners and desire to clear themselves as much as possible of blame for a crime, such testimony should be highly scrutinized by the jury."

Record at 1906a–b. This language is taken almost verbatim from *Newman v. State,* (1975) 263 Ind. 569, 572, 334 N.E.2d 684, 686–87. Appellant contends these tendered instructions properly state the law and covered an area not adequately addressed by the instructions which the court gave.

■ It is true that Daniel Stonebraker and Michael Wright testified against appellant Drollinger, and that they had received immunity for this testimony and had been offered reduced charges in exchange for this testimony. Appropriately, these facts were fully presented to the jury. *See Barnes v. State, supra; Newman v. State, supra; Adler v. State, supra.* These tendered instructions were not thereby made proper, however, "The mere fact that certain language or expression are used in the opinions of this Court to reach its final conclusion does not make it proper language for instructions to a jury." *Jacks v. State,* (1979) Ind., 394 N.E.2d 166, 174.

In *Morris v. State,* (1977) 266 Ind. 473, 364 N.E.2d 132, the defendant tendered an instruction which similarly advised the jury to cautiously scrutinize and evaluate the testimony of a co-defendant. We held the trial court properly refused this instruction and gave a general instruction on the credibility of all witnesses. Quoting *Turner v. State,* (1972) 258 Ind. 267, 272, 280 N.E.2d 621, 624, we explained that it would be "improper for a trial court to invade the province of the jury by commenting on the competency of or the weight to be given to the testimony of any particular witness who testifies in a case." 266 Ind. at 478, 364 N.E.2d at 136. *See Murphy v. State,* (1977) 267 Ind. 184, 196, 369 N.E.2d 411, 417.

Likewise, in the case before us, the court gave the following instruction:

"You are the judges of the credibility of the witnesses and the weight to be given to their testimony. You should reconcile the evidence in this case upon the theory that each and every witness has spoken the truth, if it can be reasonably done. You should not disregard the testimony of any witness without due consideration and without just cause. If you find a conflict in the testimony of the witnesses that you cannot reconcile, then it is your province to choose whom you will believe and whom you will not believe.

In determining what evidence you will receive and what you will reject, you make take into consideration the interest, if any, that any witness has in the result of this trial, his or her manner or demeanor upon the witness stand, the probability of his or her testimony, his or her means of knowing the things about which he or she testified, his or her relationship, if any, to the accused or other interested persons, any bias or prejudice of any witness disclosed by the evidence, any motivation for a witness to testify, and such other considerations as may appear right and proper to you in arriving at the truthfulness of each and every witness."

Record at 1934. This instruction correctly stated the law. *Moore v. State,* (1977) 267

Ind. 270, 275, 369 N.E.2d 628, 631; *Murphy v. State, supra; Sypniewski v. State,* (1977) 267 Ind. 224, 232, 368 N.E.2d 1359, 1364. For these reasons, the trial court properly refused appellant's tendered instructions.

### X.

Appellant next contends that the "totality" of the errors alleged above had the effect of denying him due process. The trial court was presented with several major questions and problems in this case, and we believe the court generally handled these issues properly. Inasmuch as appellant has shown only one minor error in the conduct of the trial, we conclude he was not denied due process. *Cf. Baniszewski v. State,* (1970) 256 Ind. 1, 261 N.E.2d 359.

### XI.

Finally, appellant Drollinger challenges the sufficiency of the evidence. In support of this issue, he makes two arguments: first, he claims the State's key witnesses were not believable; second, he asserts there was no evidence to show that he acted with premeditated malice.

Appellant would have us disregard, or dismiss as unbelievable, the testimony of his co-defendants, Stonebraker and Wright. He also says that Betty Spencer's prior inconsistent statements and descriptions of the assailants raise grave doubts as to her ability to identify Drollinger as one of the perpetrators. This argument ignores our well-established standard of review in cases where the evidence is claimed to be insufficient. We will not reweigh the evidence nor judge the credibility of witnesses. *E. g., Ashbaugh v. State,* (1980) Ind., 400 N.E.2d 767, 775; *Stanley v. State,* (1980) Ind., 401 N.E.2d 689, 693; *Willard v. State,* (1980) Ind., 400 N.E.2d 151, 160. These are functions for the jury to perform. *E. g., Love v. State,* (1979) Ind., 393 N.E.2d 178, 180; *Riggenbach v. State,* (1979) Ind., 397 N.E.2d 953, 956; *Taggart v. State,* (1979) Ind., 390 N.E.2d 657, 659. In the case before us, Stonebraker and Wright admitted their involvement in the murders and named Drollinger not only as a co-participant, but the person who planned and directed their activities. An accomplice is a competent witness, and one may be convicted on the uncorroborated testimony of an accomplice. *Roseberry v. State,* (1980) Ind., 402 N.E.2d 1248, 1251–52. Here, in fact, two of Drollinger's accomplices fully incriminated him, and each substantially corroborated the other's testimony. Further, the lone survivor of this incident, Betty Spencer, absolutely identified Drollinger at trial as one of the perpetrators. While Drollinger steadfastly denied any involvement in these murders, the jury was free to believe whomever they wished. *Riggenbach v. State, supra; White v. State,* (1979) Ind., 397 N.E.2d 949, 952; *Sypniewski v. State,* (1977) 267 Ind. 224, 232, 368 N.E.2d 1359, 1364.

The murder statute in effect when these crimes were committed, Ind.Code § 35–13–4–1 (Burns 1975), required proof of a killing done "purposely and with premeditated malice." Drollinger contends no premeditated malice has been shown. The evidence plainly does not support this assertion. In the afternoon and evening of February 13, 1977, within approximately six to twelve hours before the murders, Drollinger and his companions were "riding around" in Drollinger's truck. Drollinger stated that he wanted to stop somewhere "to kill some people" for no purpose, "just for enjoyment." The three shotguns used in the slayings and the .38 caliber revolver were in the truck at that time. Drollinger was driving the truck, and at one point stopped the truck and shot a dog, to show "how easy it was to kill a person."

Later that night, Drollinger met with his attorney in a Crawfordsville motel to discuss Drollinger's ongoing trial in Montgomery County on drug-related charges. After this meeting, Drollinger, Stonebraker, Wright and Smith transferred the weapons into a car which one of them had rented during the previous week. The four men then began to drive around in the country again, looking for a place in which to commit robbery and murder. After they had driven for approximately one hour, Drollinger picked out the Spencer mobile home. The Spencer home apparently was chosen only because there were several late model

automobiles in the driveway, leading Drollinger to conclude the occupants might have a great deal of money.

Drollinger then drove the car onto a side road, and the group began to ready themselves for entry into the mobile home. Drollinger passed out a pair of gloves to each of the others. He had earlier fully loaded and checked each of the shotguns. On the Saturday before the killings, Drollinger sawed the barrel off each of the shotguns. Stonebraker testified that Drollinger began to talk about killing the occupants of the trailer and how to search the premises and subdue the people inside. Drollinger suggested that the four men make a pact that each would participate in shooting the occupants or be shot by the other participants. Stonebraker stated that he began to tie a handkerchief around his face when Drollinger told him that was not necessary, because no one would be left alive to identify them.

Once inside the mobile home, the four men forced Betty Spencer and her four sons to lie face down side by side on the living room floor. Drollinger and Wright then searched the home for money and guns, while Stonebraker and Smith guarded the victims. Drollinger then determined from the victims which of their cars contained the most gasoline. Drollinger obtained the keys, went outside and started that car and the car in which they had arrived. He situated the two vehicles at the end of the driveway, facing the road. Drollinger then proceeded to puncture the tires of the remaining vehicles.

Drollinger went back inside the mobile home, where the others were waiting for his direction. Stonebraker, Wright and Smith were each holding one of the shotguns, and Drollinger was carrying the .38 caliber pistol. After receiving Drollinger's signal, Stonebraker, Wright and Smith began shooting each of the victims in the head or upper body at close range. At some point, one of the victims raised his head up and screamed, "Don't shoot me anymore!" Upon hearing this, Drollinger took Smith's shotgun, grabbed the victim by the hair, held the gun so that the barrel was approximately six inches from the victim, and shot

him again in the back of the head. Drollinger then kicked each of the victims to determine if any were still alive. Concluding that Betty Spencer was alive, Drollinger ordered Stonebraker to shoot her again. Stonebraker fired, but the blast struck only a glancing blow and knocked off Mrs. Spencer's wig. The four gunmen then left the scene, two in their car, and two in the car belonging to the victims.

Premediation is defined as the deliberate formation of an intent to perform a future act. *Harris v. State*, (1978) Ind., 377 N.E.2d 632, 633; *Strickland v. State*, (1977) 265 Ind. 664, 668, 359 N.E.2d 244, 248. Malice is any evil design, the dictate of a wicked, depraved and malignant heart. *McKinstry v. State*, (1975) 264 Ind. 29, 35, 338 N.E.2d 636, 640, *quoting* 4 W. Blackstone, *Commentaries* 198. Premeditated malice, in the context of murder, is shown where a mind has conceived of the thought of taking human life, this thought has been meditated upon, and a deliberate determination has been formed to do the act. *Horace v. State*, (1978) Ind., 382 N.E.2d 929, 931. From the above recitation of some of the facts of this case, it is clear there was ample evidence on the issue of premeditated malice. *See Williams v. State*, (1978) 269 Ind. 193, 379 N.E.2d 449; *Mosley v. State*, (1978) 266 Ind. 675, 366 N.E.2d 648. Without any doubt, there was substantial evidence of probative value from which the jury could have found Drollinger guilty beyond a reasonable doubt of four counts of first degree murder.

The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.