James BREWER, Appellant,

v.

STATE of Indiana, Appellee.

No. 485 S 167.

Supreme Court of Indiana.

Aug. 6, 1986.

Rehearing Denied Oct. 24, 1986.

Susan K. Carpenter, Public Defender, Paul Levy, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Petitioner, James Brewer, convicted of murder while perpetrating a robbery, was sentenced to death on March 1, 1978, in accord with the jury's recommendation. His conviction and sentence were affirmed in *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, *cert. denied,* 458 U.S. 1112, 102 S.Ct. 3510, 73 L.Ed.2d 1384. Petitioner filed a Motion for Post-Conviction Relief which was denied on Jan-

uary 24, 1985. Petitioner now directly appeals this denial, alleging the post-conviction court incorrectly determined the following errors had not occurred at trial:

1. ineffective assistance of trial counsel;

2. denial of a motion for continuance;

3. failure to be given *Miranda* warnings before undergoing a psychiatric evaluation ordered by the court;

4. failure to instruct the jury of their power to decline recommendation of the death penalty;

5. failure to allow defendant to be present at all critical stages of the proceedings;

6. denial of the right to a jury drawn from a fair cross-section of the community;

7. the giving of an instruction allowing the jurors to impute co-defendant's culpability to the defendant; and

8. denial of a Motion for Funds to Hire Experts for an investigation.

The facts underlying the murder of which Petitioner was convicted are as follows. Two well dressed men gained entrance to the Skirpan's residence in Gary, Indiana by purporting to be the police. Once inside, they announced a robbery. One perpetrator was identified as Kenneth Brooks, the other as Petitioner Brewer. During the robbery, sixteen (16) year-old Stephan Skirpan was fatally shot. Stephan's father claimed Petitioner fired the fatal shot, however, there was some discrepancy in Mr. Skirpan's testimony as he later testified Brooks was holding a gun of the same type shown to have been the murder weapon. While the family was held at gunpoint, Brooks and Petitioner robbed them. After the assailants fled, the police and an ambulance were summoned. However, Stephan Skirpan was dead upon their arrival.

## I

Petitioner contends the post-conviction court erred by failing to find Petitioner was rendered ineffective assistance of trial counsel because counsel knowingly introduced perjured testimony. Petitioner claims that a week before trial, long after his counsel had filed an alibi notice, Petitioner told his attorney the alibi was not true. Petitioner, nonetheless, insisted upon presenting the alibi defense. Petitioner's attorney thereafter refrained from further contacting the alibi witnesses and did not further investigate the alibi defense. At the post-conviction hearing, Petitioner's trial counsel testified that due to Petitioner's equivocation regarding the alibi and his insistence that the alibi be presented, he felt it was his ethical duty to proceed according to his client's demands. Petitioner now maintains that the weak testimony elicited from the alibi witnesses prejudiced his case.

Ineffective assistance of counsel was an issue raised on direct appeal in this case. Although this particular argument was not advanced on appeal, Petitioner has failed to indicate why he was precluded from raising it at that time. Because post-conviction relief is unavailable for issues available to Petitioner upon original appeal, Petitioner in the instant case has waived this issue. *Bailey v. State* (1985), Ind., 472 N.E.2d 1260, *reh. denied.* Moreover, Petitioner has failed to demonstrate reversible error by asserting this argument. One week before trial was to commence Petitioner changed his version of what transpired, nonetheless insisting his alibi defense be presented. His attorney did not know which version Petitioner had given him was the truth. Being caught in a potential ethical bind to follow his client's demand and yet not present possibly perjured testimony, he refrained from further investigating the alibi witnesses until trial. The alleged weakness of the witnesses' testimony is hindsight. Petitioner obviously did not anticipate, nor does he demonstrate, prejudice attributable to the alibi witnesses' testimony. Petitioner's whole argument can be reduced to the claim that his counsel used poor trial strategy, strategy the Petitioner insisted be used. Isolated poor strategy, inexperience, or bad tactics do not necessarily amount to ineffective counsel. *Murphy v. State* (1985), Ind., 477

N.E.2d 266. In this particular case, counsel's decision to proceed with the alibi, per Petitioner's demand, did not amount to ineffective assistance of counsel.

## II

Petitioner assigns as the next error, the post-conviction court's failure to find reversible error when the trial court denied a motion for continuance. Following the return of the guilty verdict by the jury, Petitioner moved for a continuance of the sentencing hearing. The motion was denied because it was not premised upon any grounds and because the jury was sequestered. When this issue was raised on direct appeal we determined it was unfounded because the denial of a motion grounded upon sheer speculation that some benefit might flow from it cannot be said to be arbitrary or abusive. *Brewer*, 417 N.E.2d at 906. This same rationale still applies.

The quantum of evidence compiled subsequent to the trial court's determination does not affect our initial decision on direct appeal. The determination to be made upon review, whether direct appeal, post-conviction relief, or appeal from the post-conviction relief proceedings is the same; namely, whether the trial court abused its discretion in denying the motion for continuance. *Drollinger v. State* (1980), 274 Ind. 5, 408 N.E.2d 1228, 1231. In the instant case, the trial judge refused to grant a continuance primarily because the jury was sequestered during this time and the motion did not specify any benefit which would accrue from continuing the sentencing. These remain the facts as they occurred at trial and the trial court did not abuse his discretion for denying this motion.

Petitioner also fails to demonstrate any prejudice warranting relief. He introduced twelve (12) documents at the post-conviction hearing, alleging they comprised the material for which he requested a continuance. The materials consisted of reports dated no later than Petitioner's sixteenth (16th) year, primarily demonstrating a record of juvenile delinquency and a low I.Q., often labelling Petitioner as mentally retarded. However, the trial court, having denied the motion for a continuance due to the sequestration of the jury, appointed a psychologist to examine Petitioner before the trial court imposed sentence. The psychologist's report contained mitigating information equivalent to the reports entered at the post-conviction hearing. Therefore, the trial court took into consideration the psychologist's opinion that Petitioner is in the lowest seven percent of the population as to general intelligence, acts on feelings and impulses without intelligent reflection or analysis and tends not to learn from experiences. Further, the trial court had before it the pre-sentence report demonstrating that Petitioner had problems conforming his behavior to the law from an early age. Accordingly, Petitioner was not prejudiced as the major factors he desired to have considered were presented before a final determination of sentencing was made by the trial judge. We finally note that because Petitioner has not presented an issue of fundamental error, our initial decision on appeal precluded him from raising this issue again. *Bailey, supra.* Nonetheless, we chose to address Petitioner's argument, concluding it was unfounded.

## III

Subsequent to the jury's recommendation of the death penalty, but prior to sentencing, the trial court ordered a psychiatric examination of Petitioner, *sua sponte.* Petitioner received no further admonition regarding his constitutional right against self-incrimination at this time. The psychologist's report was incorporated into the record without objection by Petitioner. Petitioner now cites *Estelle v. Smith* (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, decided after Petitioner's direct appeal, as grounds for claiming the trial court committed reversible error by not informing him of his right against self-incrimination and his right to counsel during the psychiatric examination.

*Estelle* does not apply to the facts of Petitioner's case. In *Estelle* a psychiatric examination was ordered by the court to determine the defendant's competency to stand trial in a capital murder case. The defendant was not advised of any rights prior to or during the examination. At the sentencing phase of the defendant's trial, evidence of the examination was used to establish the defendant's future dangerousness. A defendant's future dangerousness was one of three issues under that State's, (Texas), law that the State needed to prove beyond a reasonable doubt before imposition of the death penalty. The United States Supreme Court held under these facts that the defendant was entitled to an advisement of rights prior to submitting to the psychiatric examination. However, in *Estelle* the examination elicited incriminatory information which was used to establish a requisite element for imposition of the death penalty. The reasons given by the trial court in the instant case for imposing the death sentence reflect that his purpose in ordering the examination was to determine if any circumstances militated against the recommendation. More importantly, there was nothing in the report prejudicial to Petitioner's interest. Therefore, the post-conviction court did not err by determining Petitioner's rights were not violated in this instance.

### IV

Petitioner next claims the jury was not properly informed of their right to reject the death penalty. He raises this issue under the guise of ineffective assistance of appellate counsel, claiming appellate counsel should have raised this error upon direct appeal. However, appellate counsel's prudence in not raising this argument posits the issue as one which could and should have been raised on direct appeal, if at all, and thereby has been waived. *Bailey, supra.*

Appellate counsel did not render ineffective assistance by failing to raise on appeal the sentencing instructions at trial, alleging the trial court erroneously failed to instruct the jury of its option not to recommend a death sentence. More specifically, Petitioner now claims the instructions were inadequate for failing to guide the jury in understanding they could refrain from recommending the death penalty even if the aggravating circumstances outweighed the mitigating circumstances. The guidelines for determining competence of counsel require deciding whether counsel's performance was so deficient that he or she was not functioning as counsel as guaranteed by the Constitution, and, if so, whether this failure to function as counsel was prejudicial, that is, counsel's errors were so serious as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Broadus v. State* (1986), Ind., 487 N.E.2d 1298. Appellate counsel was not ineffective for two salient reasons. First, there was no objection at trial regarding the failure to make this specific instruction, thereby waiving this issue. Second, the trial court did adequately instruct the jury they could decline to recommend the death penalty if they also found aggravating circumstances outweighed mitigating circumstances. The trial court gave the following instructions:

"The Jury *may* recommend the death penalty only if it finds:

1) That the State has proved the existence beyond a reasonable doubt of the aggravating circumstance alleged in their charging indictment; and

2) That any mitigating circumstances that exist are outweighed by the aggravating circumstances...." (emphasis added).

This instruction clearly guided the jury in their understanding of aggravating and mitigating circumstances and conveyed their option to not recommend the death penalty even if the aggravating circumstances outweighed the mitigating ones. Accordingly, Petitioner's argument fails to establish appellate counsel was ineffective under the *Strickland* guidelines, thereby failing to demonstrate any error.

## V

Petitioner asserts he was denied the right to be present at all critical stages of the trial proceedings when the trial court addressed the jury in response to questions raised during deliberations in the absence of Petitioner. During the penalty phase deliberations, the jury asked to be informed as to the range of sentences of imprisonment should the death penalty not be imposed. Purportedly waiving the presence of Petitioner, defense counsel participated with the prosecutor and the court in formulating an answer to the jury's request. On direct appeal, Petitioner did not present his lack of presence as error, although he did raise the contents of the instruction. Petitioner now fails to advance any reason why this issue could not have been and was not raised on direct appeal. In that this new argument does not raise an issue of fundamental error it has been waived. *Bailey, supra.*

The trial court did not commit fundamental error by reciting the law to the jury on the statutory sentence to be imposed if the death penalty were not recommended. Petitioner's trial counsel expressly waived the presence of Petitioner at this stage in the proceedings. Defense counsel's rationale for doing so was that summoning the Petitioner, who had returned to the jail, was unnecessary and too time consuming in light of the fact that the judge was merely reciting the sentencing laws to the jury. Petitioner was not prejudiced as his attorney represented his interests on a matter solely concerning the law. Accordingly, the fact that Petitioner was not present during response to the jury's inquiry did not constitute fundamental error.

## VI

Petitioner next seeks relief on the basis that the jury was not a representative cross-section of the community because several jurors were excused for having stated they could not impose the death penalty. Petitioner argues the result was a jury panel predisposed to recommending the death penalty.

We have long adhered to the concept that prospective jurors may be excused for cause if they will not consider returning a recommendation for the death penalty. *Adams v. Texas* (1980), 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581; *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; *Davis v. State* (1986), Ind., 487 N.E.2d 817. Petitioner urges us to reconsider our past holdings in light of *Grigsby v. Mabry* (8th Cir.1985) 758 F.2d 226. The Circuit Court in *Grigsby* began its analysis by labelling venire persons who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them as "Witherspoon excludables" or WEs. *Grigsby,* 758 F.2d at 229. The Circuit Court then held in *Grigsby* ". . . that a capital jury, with WEs stricken for cause, is in fact conviction prone and, therefore, does not constitute a cross-sectional representation in a given community." *Grigsby,* 758 F.2d at 229. However, other circuit courts reviewing similar studies have refused to follow the same rationale citing *Witherspoon* for authority in doing so. *Keeton v. Garrison* (4th Cir., 1984) 742 F.2d 129; *Spinkellink v. Wainwright* (5th Cir.1978), 578 F.2d 582, *cert. denied,* (1979) 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796. *Grigsby* is neither persuasive law nor consistent with our well established view of allowing jurors to be excused for cause when the process does not violate *Witherspoon.* Accordingly, Petitioner has failed to demonstrate error on this issue.

## VII

Petitioner next claims it was error for the trial court's instruction at trial and sentencing to permit the jurors to impute a co-defendant's culpability to Petitioner. Although this issue was raised on direct appeal and was decided adverse to Petitioner's interest, Petitioner claims *Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, decided after Peti-

tioner's direct appeal, mandates a different result.

 *Enmund,* widely known as the "Triggerman case," permits the death penalty to be imposed upon a person whose criminal liability for a murder is imputed from participation in a scheme resulting in capital murder only when it is based on an individualized consideration of the actual culpability of the offender. *Enmund* disallows the imposition of the death penalty for a defendant who aids and abets a felony in the course of which murder is committed by others, but who does not himself kill, attempt to kill, intend to kill, or contemplate that life would be taken. Petitioner's claim, that he was not the "triggerman" and therefore the facts of his case fall within the purview of *Enmund,* is incorrect. As stated on direct appeal, "... we have hereinbefore held that there was evidence to support a finding beyond a reasonable doubt, that the defendant was the 'triggerman'...." *Brewer,* Ind., 417 N.E.2d at 909. However, even assuming Petitioner was not the actual triggerman, the evidence is clearly sufficient to show Petitioner contemplated life would be taken during this armed robbery. Petitioner was armed when he approached the Skirpans under the false pretense of being with the police. When he and Brooks did not gain immediate entrance into the Skirpan's home, Petitioner exclaimed, "This is a hold up!" Petitioner, with his handgun drawn, entered the Skirpan's home, demanded money and with the assistance of his accomplice succeeded in robbing the Skirpans. These facts sufficiently demonstrate at the least Petitioner had contemplated life would be taken during the robbery. The facts also strongly indicate Petitioner attempted to take the lives of those present and intended to do so if they interfered with his perpetration of the robbery. The trial court referred to these facts in making its finding that "even if a jury had some doubt about that [Brewer firing the fatal shot], certainly there was no evidence that his participation was relatively minor". *Brewer,* Ind., 417 N.E.2d at 902, n. 3. *Enmund,* therefore, is not applicable to the facts of this case, and Petitioner has failed to demonstrate any error.

## VIII

Petitioner finally claims he was denied due process and equal protection of the law when the trial court denied him funds to hire experts to determine whether the death penalty is discriminatorily applied on the basis of race. At the hearing on the petition for post-conviction relief, Petitioner demonstrated that neither the Indiana Supreme Court, the Indiana Attorney General, nor the Lake County Prosecuting Attorney possessed or maintained any statistical data relating to race, sex, or economic class of defendants and victims in Indiana homicide cases. His only basis for hypothesizing race might be an issue is that of fifteen (15) death sentences pending, comprised of eight caucasians and seven blacks, there was only one person sentenced for murder of a black victim.

 It is well settled that an accused is not constitutionally entitled at public expense to any type of expert the accused desires to support his case. This matter is commended to the sound discretion of the trial court whose determination will not be overturned absent a showing of abuse of discretion. *Wisehart v. State* (1985), Ind., 484 N.E.2d 949, *reh. denied.* The statistics Petitioner presented at trial did not provide a sound basis for suspecting the death sentence was being imposed in a discriminatory manner. The trial court did not abuse his discretion in denying funds to Petitioner to hire an expert based on such tenuous showings of any racial discrimination. Accordingly, Petitioner has failed to demonstrate any reversible error.

The post-conviction court is in all things affirmed.

GIVAN, C.J., and DICKSON, J., concur.

DeBRULER and SHEPARD, JJ., dissent with separate opinions.

DeBRULER, Justice, dissenting.

It is now more apparent than at the time of our initial opinion in this case, *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, (DeBruler, J. Dissenting) that the judicial process employed in arriving at this sentence of death is flecked with constitutional defects. It is now manifest on this record, by reason of the accomplice instruction in the case of the jury, and by reason of the reliance upon the resulting and hopelessly ambiguous verdict of guilty of intentional murder in the case of the sentencing court, *Brewer*, supra, at 901, fn. 3, that there has been no determination made by court or jury that Brewer himself killed, attempted to kill or intended that killing take place or that lethal force be employed. That finding is a requirement of the Eighth Amendment which must be met before death can be imposed. *Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140. I vote to grant post-conviction relief.

Shepard, Justice, dissenting.

I conclude that Brewer was denied his constitutional right to effective assistance of counsel when his attorney knowingly used perjured testimony in an attempt to establish a phony alibi. To establish a successful claim of ineffectiveness of counsel, a defendant must show, first, that his attorney's performance fell below minimal professional standards and, second, that counsel's poor performance harmed the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Both prongs of the *Strickland* standard are satisfied here.

It is beyond dispute that an attorney must not knowingly use false testimony. *Code of Professional Responsibility*, DR 7–102(A)(4). To do so constitutes conduct below the minimum acceptable level. *Id.*, Preliminary Statement. The record in this case clearly establishes that Brewer's counsel *knew* the alibi testimony was false. Ten days before the trial, Brewer told his attorney he had been robbing the Skirpan family with Kenneth Brooks when Steven Skirpan was killed. He told his attorney

that the proposed alibi witnesses would manufacture their testimony. Counsel testified at the hearing on the motion to correct error, "I knew (the alibi) was staged all along."

The attorney recognized an ethical dilemma and, unfortunately, resolved it unethically. He determined wisely enough that he could not confer with the witnesses prior to trial and abet their lies, but he called them to the stand and knowingly elicited false testimony. By this conduct, Brewer's counsel represented him inadequately. It happened that the witnesses were, as counsel later stated, "ridiculously" unbelievable and their testimony blatantly contrived. Therefore, I believe the consequential harm to the defense was also beyond dispute.

The harm to Brewer resulting from counsel's performance was later exacerbated when, on counsel's advice, Brewer took the stand during the penalty phase of the bifurcated trial. Counsel testified that he wanted to "humanize" Brewer in the eyes of the jurors, hoping they would become reluctant to sentence a fellow human being to die. He realized, of course, that they had not been misled by the perjurious alibi testimony; they had returned a verdict in a very short time. Instead of "humanizing" Brewer, his testimony resulted in the revelation that he *had* been in the Skirpan's house and had asked the witnesses to lie for him at trial. The State in turn used this admission to emphasize repeatedly to the jury that Brewer attempted to defraud them through his witnesses and that he was unwilling to take responsibility for his crime until cornered.

The State's evidence against Brewer was completely circumstantial. This Court acknowledged in its opinion on direct appeal that Brewer was never identified by the victims. *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889. He was identified as the perpetrator and admitted his participation in *other* crimes committed that day with Kenneth Brooks, and Brooks was identified as one of the Skirpan robbers. Yet, the State had no direct proof that Brewer was in the Skirpan house. In fact,

as this Court stated in its earlier opinion, "[The witnesses'] testimony concerning the height and the sound of the voice of the unidentified assailant did not match such characteristics of the defendant ...". *Id.,* at 893.

This is a capital case and must be reviewed with utmost care. It seems to me reasonably likely that either the verdict or the jury's recommendation of death, or both, would have been different had the proceedings not been tainted with the poorly executed, abhorrent, and incriminating attempt to deceive the jury and the court. Any one of the jurors harboring a reasonable doubt about Brewer's guilt or a disinclination about recommending he be sentenced to death would likely have been persuaded otherwise when presented with his blatant attempt to prostitute the system.

The soundness of the process by which we reach these decisions is a matter of particular importance and a proceeding which featured full-fledged subornation of perjury and unethical action by defense counsel is not the best basis for the imposition of society's ultimate penalty. It is impossible to evoke any sympathy for James Brewer, whose desire to perpetrate a fraud created the opportunity to which his lawyer succumbed. Nevertheless, the lawyer's duty was to represent his client zealously, within the bounds of the law, and in the exercise of sound professional judgment, not to defer to the tactics of an untrained, uninformed client bent on a fraudulent alibi. Regardless of Brewer's dark intentions, he was entitled to a fair trial and effective representation. There is nothing in the record to indicate that Brewer, lacking intelligence and foresight, was advised ahead of time of the possible consequences of presenting perjured testimony. I perceive no basis upon which a determination could be made that Brewer, by requesting this unsound and illegal strategy, waived his right to claim ineffectiveness of counsel.