935 F.2d 850
 James BREWER, Petitioner-Appellee,
v.
James E. AIKEN, Commissioner, Indiana Department of
Corrections, and G. Michael Broglin, Director,
Diagnostic Center, Plainfield, Indiana,
* Respondents-Appellants.
 No. 90-2530.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 30, 1990.
Decided June 14, 1991.
 
 Jessie A. Cook, Trueblood, Harmon, Carter & Cook, Terre Haute, Ind., for petitioner-appellee.
 Linley E. Pearson, Atty. Gen., David A. Arthur, Deputy Atty. Gen., Federal Litigation, Indianapolis, Ind., for respondents-appellants.
 Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 James Brewer was convicted of murder February 17, 1978, after a jury trial and was sentenced to death on March 1, 1978, in accordance with the jury's recommendation. After exhausting his state court remedies, see Brewer v. State, 496 N.E.2d 371 (Ind.1986) (Brewer II ), Brewer petitioned the federal district court for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. The district court rejected Brewer's assertion that the guilt phase of his trial was constitutionally defective, but found that Brewer received ineffective assistance of counsel during the penalty phase of his trial, and the judge entered an order granting the writ of habeas corpus unless the State of Indiana provided Brewer a new sentencing hearing within 90 days. The district court ordered a permanent stay of execution pending the outcome of the new sentencing hearing. We affirm.
 
 I. BACKGROUND
 
 2
 The facts underlying Brewer's murder conviction are uncontested on appeal. About 5:00 p.m. on December 4, 1977, Brewer and an accomplice, Kenneth Brooks, gained entrance into the Skirpan residence in Gary, Indiana, by representing that they were police detectives investigating an accident involving one of the Skirpan cars. Once inside the house, the two well-dressed men announced a robbery and held the family at gunpoint. During the robbery, Brewer fatally wounded 29-year old Steven Skirpan.
 
 
 3
 During the investigation witnesses identified Brewer as the man who, along with Brooks, perpetrated an armed robbery of a gas station at 4:30 p.m. and three other armed robberies in an apartment building about 7:45 p.m. earlier during the day of the Skirpan murder. Nonetheless, when questioned by law enforcement officers Brewer initially denied being present during the Skirpan murder and later informed his court-appointed attorney that he was at his girlfriend's house when Brooks and another man robbed the Skirpans in their home. Brewer asked his attorney to present his girlfriend and another woman as alibi witnesses at trial, but shortly before trial he informed his attorney that he had participated in the Skirpan robbery and also that he had written a letter to his girlfriend instructing her and her friend to present a fictitious alibi. In spite of the fact that Brewer's counsel had knowledge that the two alibi witnesses would provide perjured testimony, he called both women to testify. Upon cross-examination, it became evident that the alibi had been contrived.
 
 
 4
 The jury reached a verdict of guilty in short order, and the trial moved into the sentencing phase. Although Brewer's counsel was an experienced criminal defense attorney, he was unaware that the sentencing hearing would immediately follow the guilt phase, but it should be pointed out that Brewer was the first defendant prosecuted under the new Indiana death penalty statute. Shortly after the guilty verdict, the judge held an informal conversation with the prosecutor and the defense counsel at which time they discussed the method of procedure to be followed during the sentencing phase of the newly instituted bifurcated trial procedure. During this conference defense counsel requested a continuance of a week or more for the purpose of collecting his thoughts in preparation for the penalty phase and to follow up on information he had just received regarding Brewer's extensive psychiatric history and problems commencing with his boyhood. According to the trial judge's recollection of counsel's informal request, the court refused because the jury was sequestered. This off-the-record conference occurred about 2:45 p.m. Friday afternoon, and the court reconvened for the penalty phase on the following day around 9:00 a.m.
 
 
 5
 Since the defense attorney had so little time to prepare for the sentencing phase,[1] he stated he was unable to verify and investigate the information he received regarding Brewer's mental history. Under the court order to proceed at once, the defendant's counsel felt that his only hope of avoiding a jury recommendation of the death penalty would be to "humanize" Brewer in the eyes of the jury through putting him on the stand as a truthful witness denying that he was the one who pulled the trigger at the time of the murder, as he (defense counsel) believed that the jury was undecided as to which robber shot Skirpan. Brewer's counsel waived opening argument at the penalty phase without explanation and deliberately chose not to present character witnesses, for he was of the opinion that placing the defendant's character at issue would do more harm than good. Based upon the discussion during the aforementioned informal conference among the prosecutor, defense counsel and the judge, Brewer's attorney believed that cross-examination would be limited in scope and thus other crimes testimony would not be allowed. Relying on this expectation of limited cross examination testimony, counsel persuaded Brewer to testify at the penalty phase of the bifurcated trial despite the defendant's misgivings. Nevertheless, in view of Brewer's testimony that it was Brooks who shot Skirpan, the court ruled that questions concerning another robbery in which Brewer and Brooks participated that day would be admissible only as to the question of impeachment. While being questioned concerning the robbery, which occurred earlier on the date of the Skirpan murder, Brewer admitted having knowledge that Brooks would shoot at people during the course of a robbery because of his conduct during the shooting incident in the earlier robbery that day. Brewer on cross-examination also admitted that he fired his pistol at the police officers who arrested him and that he had been deliberately vague in telling the police where his alibi witness lived because he wanted the opportunity to speak with her and give her the false alibi before the police had an opportunity to question her. Brewer's cross-examination was also damaging concerning the details of the murder and robbery, including the fact that Brewer had to step over the body of the murder victim in order to perpetrate the robbery. Despite the devastating testimony and his recently acquired knowledge regarding Brewer's psychiatric problems, defense counsel chose not to question Brewer about his mental history while he was on the stand, and in counsel's closing argument he merely focused on the issue of who actually pulled the trigger and highlighted the evidence that he believed demonstrated that Brooks shot Stephen Skirpan. So in their sentencing deliberations, the jury was faced with a self-admitted prevaricator (Brewer confessed concocting the alibi) and a thief who was willing to shoot at police and walk over a murder victim's body to commit another crime. For some reason Brewer's attorney decided not to present any mitigating evidence to counter the negative impression this evidence would most certainly have engendered. To the surprise of no one, the jury recommended the death sentence.
 
 
 6
 As part of the presentence investigation, the court ordered a psychological exam of Brewer "to determine the performance I.Q. of the defendant." The psychologist's report stated that he
 
 
 7
 "examined Mr. James Brewer and tested him with the Wechsler Adult Intelligence Scale (WAIS), the Rorschach and the Thematic Apperception Test.
 
 
 8
 "His intelligence as obtained on the WAIS is:
 
 Verbal I.Q. 73
 Performance I.Q. 82
 Full Scale I.Q. 76
 
 9
 "He reaches into the dull-normal range of intelligence in some of his tests but has overall intellectual functioning in the borderline range of intelligence. That is, that range which includes the lowest seven (7%) percent of the population.
 
 
 10
 "In his personality as obtained on the other two tests, he reveals a shallow mind that perceives the superficial aspects of reality. Does not analyze. Does not reflect within himself the events of his life or of others. Consequently, he lacks real understanding. He simply acts on feeling and impulse. He appears to live pretty much on the moment without thinking ahead nor looking much behind. Consequently, he tends not to learn from his experiences."
 
 
 11
 The presentence investigation report included information to the effect that Brewer had received two or three shock therapy treatments at about the age of 10, that he participated in a number of psychiatric conferences (the presentence report failed to mention the psychiatric reports generated from the interviews) and that he failed to complete the 9th grade in school.
 
 
 12
 After considering the jury's recommendation as well as the presentence report, the state judge sentenced Brewer to death:
 
 
 13
 "Having given this matter thoughtful and prayerful consideration for the last ten (10) days, having undertaken a truly agonizing reappraisal of my personal values and judgments, and being fully cognizant of the awesome responsibility that is mine, I am now prepared to follow the recommendation of the jury.
 
 
 14
 "James Brewer was introduced to the system at the age of 11. Eleven years old, he was committed to Indiana Boys' School. He was there for a short period of time, paroled, returned again as a parole-violator at age 12. Paroled for a short time, returned again at age 14 as a parole-violator. Was again paroled, returned again at the age of 15 for the fourth time to the Indiana Boys' School. Thereafter, James Brewer graduated from Indiana Boys' School, went to the Indiana State Farm for the crime of theft. Was paroled, thereafter, returned again for Assault and Battery With Intent to Commit a Robbery. Entering with Intent to Commit a Felony; was again returned to the Indiana State Farm. Released again. Now, he is before the Court with an ultimate charge.
 
 
 15
 "I had your client examined, not to determine comprehension, but to get some idea of the intelligence level of your client. I find him to be of borderline intelligence. I find that our institutions in the State of Indiana, who is now requesting that the Defendant be put to death, had an opportunity to work with the Defendant from the age of 11. Again, having been returned four times to the Indiana Boys' School, served a total of two years during that period of time. He was sent to the Indiana State Farm twice. He has been unable to probe the mind of James Brewer. We have been unable to find any potential to rehabilitate him. It is unfortunate; his life has been a brutal life. He lost his mother, father at an early age. But we cannot tolerate the James Brewers of our community. We cannot tolerate their commission of crimes, for which he is here before the Court today. I am sure there will be tears shed for James Brewer. But there also were tears shed for Stephen Skirpan, the 29-year old man who did nothing at all. Who happened to be in his living room at the time James Brewer came to rob him."
 
 
 16
 The trial judge substituted a replacement counsel to present Brewer's automatic appeal of the death sentence to the Indiana Supreme Court. Brewer's second counsel presented numerous allegations of error on appeal, which the Court rejected in Brewer v. State, 275 Ind. 338, 417 N.E.2d 889 (1981) (Brewer I ). Brewer subsequently moved for, and was denied, post-conviction relief in the Superior Court. The Indiana Supreme Court also affirmed Brewer's conviction and sentence on his appeal of the denial of post-conviction relief. In rejecting Brewer's argument that it was error for the trial judge to refuse to grant a continuance for the trial attorney to investigate and prepare evidence regarding his psychiatric history, the Indiana Supreme Court held that there was no prejudice arising from trial counsel's failure to present Brewer's mental history to the jury during the penalty phase.
 
 
 17
 "Petitioner also fails to demonstrate any prejudice warranting relief. He introduced twelve (12) documents at the post-conviction hearing, alleging they comprised the material for which he requested a continuance. The materials consisted of reports dated no later than Petitioner's sixteenth (16th) year, primarily demonstrating a record of juvenile delinquency and a low I.Q., often labeling Petitioner as mentally retarded. However, the trial court, having denied the motion for a continuance due to the sequestration of the jury, appointed a psychologist to examine Petitioner before the trial court imposed sentence. The psychologist's report contained mitigating information equivalent to the reports entered at the post-conviction hearing. Therefore, the trial court took into consideration the psychologist's opinion that Petitioner is in the lowest seven percent of the population as to general intelligence, acts on feelings and impulses without intelligent reflection or analysis and tends not to learn from experiences. Further, the trial court had before it the pre-sentence report demonstrating that Petitioner had problems conforming his behavior to the law from an early age. Accordingly, Petitioner was not prejudiced as the major factors he desired to have considered were presented before a final determination of sentencing was made by the trial judge."
 
 
 18
 Brewer II, 496 N.E.2d at 374.
 
 
 19
 In this habeas action, the district court rejected Brewer's claim of ineffective assistance of counsel during the guilt phase of the trial, but held that Brewer received ineffective assistance of counsel during the penalty phase because of the false alibi presented during the guilt phase and because of defense counsel's failure to present evidence in mitigation to the jury. The trial judge stated that
 
 
 20
 "Counsel acknowledged that he knew petitioner was of 'borderline intelligence' and 'minimal educational level.' A reasonable preparation for the penalty phase would have included the discovery of this evidence and the procurement of testimony on these issues. Such testimony was readily available as the conduct of the hearing on the Belated Motion to Correct Errors and the Post-Conviction Remedy revealed.
 
 
 21
 "Counsel's failure to present the evidence of low intelligence and an excessively compliant personality and the choice to make petitioner the only witness at the penalty phase, after being shown to have suborned perjury, effectively left petitioner with no defense at all."
 
 
 22
 In response to arguments from the state that counsel's failure to present Brewer's psychiatric history to the jury was cured by presenting the information to the state sentencing judge, the district court held that "the failure to present an adequate defense to the sentencing jury is not rendered non-prejudicial by its advisory nature or the sentencing judge's subsequent consideration of similar evidence." The State of Indiana appeals the district court's holding that Brewer received ineffective assistance of counsel during the penalty phase of his trial.
 
 II. ISSUES
 
 23
 The issues we shall consider on appeal are whether Brewer received ineffective assistance of counsel during the penalty phase of his bifurcated trial as a result of trial counsel putting witnesses on the stand during the guilt phase who presented a false alibi and whether Brewer received ineffective assistance of counsel as a result of his attorney failing to present mitigating evidence to the jury during the penalty phase of the trial.
 
 III. DISCUSSION
 
 24
 Initially, we note that our habeas corpus jurisdiction under 28 U.S.C. Sec. 2254 "is limited to questions of federal and constitutional custody. In other words, 'federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law.' " Haas v. Abrahamson, 910 F.2d 384, 389 (7th Cir.1990) (quoting United States ex rel. Lee v. Flannigan, 884 F.2d 945, 952 (7th Cir.1989)). "We do not sit as a super state supreme court to review error under state law," Skillern v. Estelle, 720 F.2d 839, 852 (5th Cir.1983), so our review of the issues will focus only on the federal issues involved in this appeal. Under Sec. 2254(d), we presume that state court findings of historical fact are correct, Sotelo v. Indiana State Prison, 850 F.2d 1244, 1247 (7th Cir.1988), but questions of law or mixed questions of law and fact lack that presumption. See Sumner v. Mata, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982). Thus, we review such legal questions under a de novo standard of review. See Sotelo, 850 F.2d at 1247.
 
 
 25
 In order for Brewer to establish his claim that he received ineffective assistance of counsel, he "must show that counsel's representation fell below an objective standard of reasonableness" and "that the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "The bench mark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. When a defendant claims ineffective assistance of counsel at the penalty phase of a capital trial,
 
 
 26
 "the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."
 
 
 27
 Strickland, 466 U.S. at 695, 104 S.Ct. at 2069.
 
 A. Mitigating Evidence
 
 28
 Under the Indiana Death Penalty Statute,
 
 
 29
 "(a) The state may seek a death sentence for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one of the aggravating circumstances listed in subsection (b) of this section. In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged.
 
 
 30
 "(b) The aggravating circumstances are as follows:
 
 
 31
 "(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.
 
 
 32
 * * * * * *
 
 
 33
 "(c) The mitigating circumstances that may be considered under this section are as follows:
 
 
 34
 "(1) The defendant has no significant history of prior criminal conduct.
 
 
 35
 "(2) The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.
 
 
 36
 "(3) The victim was a participant in, or consented to, the defendant's conduct.
 
 
 37
 "(4) The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.
 
 
 38
 "(5) The defendant acted under the substantial domination of another person.
 
 
 39
 "(6) The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.
 
 
 40
 "(7) Any other circumstances appropriate for consideration.
 
 
 41
 "(d) If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing. The jury, or the court, may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing. The defendant may present any additional evidence relevant to:
 
 
 42
 "(1) The aggravating circumstances alleged; or
 
 
 43
 "(2) Any of the mitigating circumstances listed in subsection (c) of this section.
 
 
 44
 "(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:
 
 
 45
 "(1) That the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and
 
 
 46
 "(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.
 
 
 47
 "The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."
 
 
 48
 I.C. 35-50-2-9 (emphasis added). At the sentencing hearing, rather than present new evidence to justify its request for the death sentence, the state requested that all evidence introduced during the guilt phase of the trial be incorporated into the record of the penalty phase by reference. The prosecutor argued that it carried its burden of proving an intentional killing during a robbery in the guilt phase of the trial. In opposition to the death penalty, defense counsel presented Brewer as a witness in an attempt to "humanize" him in the eyes of the jury. His strategy was to persuade the jury that Brewer was not the one who killed Stephen Skirpan during the robbery and thus the aggravating circumstance of intentionally killing a person during a robbery was absent. Counsel believed that the jury had not made up their minds about whether Brewer in fact was the trigger man, and that the best defense at this point was to present a truthful Brewer who would deny shooting Steven Skirpan. On the witness stand Brewer testified that although he was present during the Skirpan robbery, it was his co-defendant, Kenny Brooks, who fired the murder weapon. In his closing argument, defense counsel attempted to negate the aggravating circumstance of intentional killing during a robbery through raising a reasonable doubt as to the identity of the person who actually killed Stephen Skirpan. Counsel also contended that the murder was not intentional, that is, that neither Brewer nor Brooks intended to kill anyone when they entered the Skirpan residence. Further, defense counsel argued that the ballistic evidence proved that it was Brooks rather than Brewer who shot Stephen Skirpan--Brewer was carrying an automatic as opposed to Brooks' revolver, and counsel argued that the cartridge found at the scene of the crime would not even fit into the chambers of Brewer's gun. Obviously, the jury chose neither to believe Brewer nor the ballistic evidence offered and recommended that Brewer receive the death penalty.
 
 
 49
 In regard to the statutory mitigating factors, the original defense counsel, James J. Frank, testified at the hearing on Belated Motion to Correct Errors that he decided not to present mitigating evidence because he felt that none of the seven factors applied: 1) no significant history of prior criminal conduct--Brewer had a history of criminal conduct from the age of 11; 2) "the defendant was under the influence of extreme mental or emotional disturbance at the time of the murder"--there was no evidence of Brewer being under mental or emotional disturbance at the time of the murder; 3) the victim participated or consented to the defendant's conduct--Frank stated that Stephen Skirpan certainly did not consent to the murder; 4) "the defendant's participation was relatively minor"--the evidence established that Brewer was more than a minor participant in the robbery (but counsel did argue that Brewer did not intend nor actually commit the murder); 5) "the defendant acted under the substantial domination of another"--counsel did not feel that Brewer had been substantially dominated by Brooks to the extent of "having been robbed of his free will"; 6) substantial impairment of capacity to appreciate the criminality of conduct or conform conduct to law because of mental disease, defect, or intoxication--from his dealings with Brewer, counsel did not suspect that "the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication"; and 7) any other appropriate circumstances--defense counsel testified that he deliberately chose not to present character witnesses because he felt that they would do Brewer more harm than good, since putting Brewer's character in issue would allow the state to present additional evidence of other crimes--"[t]here were other victims present in the Courtroom during the course of his trial ... and had we put his character in issue ... [the state] would have brought those people and placed them in front of the jury also."
 
 
 50
 Brewer argues that defense counsel's failure to search for and present mitigating evidence such as Brewer's prior employment record, his history of mental problems, his disruptive family background, his susceptibility to being easily led and the failure to present character witnesses constitutes ineffective assistance of counsel. The defense attorney's deliberate decision to forego presenting character witnesses, reasoning that placing Brewer's character in issue would have done more harm than good may well fall within "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). Moreover, Brewer has failed to make an argument as to how his employment record could have contributed to a reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id., 466 U.S. at 695, 104 S.Ct. at 2069, and we are unconvinced that the failure to present a defendant's work record, standing alone, would have had an impact or influence on Brewer's sentence. But we find Brewer's arguments regarding factors relating to his psychiatric history compelling. In Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir.1989), cert. denied sub nom., Kubat v. Greer, --- U.S. ----, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989), we held that:
 
 
 51
 "Viewing the performance of counsel solely from the perspective of strategic competence, we hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors. Mitigating factors brought out at trial might be emphasized, a coherent plea for mercy might be given, or new evidence in mitigation might be presented. But counsel may not treat the sentencing phase as nothing more than a mere postscript to the trial. While the Strickland threshold of professional competence is admittedly low, the defendant's life hangs in the balance at a capital sentencing hearing. Indeed, in some cases, this may be the stage of the proceedings where counsel can do his or her client the most good."
 
 
 52
 (Emphasis added). In our opinion, defense counsel's failure to investigate the mental history of a defendant with low intelligence demonstrates conclusively that he did not "make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors." Id. We note that since Brewer's bifurcated trial was the first one under Indiana's new death penalty scheme, we view the state judge's refusal to grant a continuance for the purpose of inquiring into Brewer's psychiatric history to have been a far more significant problem (albeit one not asserted to us) than errors we sometimes view and classify as merely harmless. Even a cursory investigation of Brewer's mental history would have revealed the following: a) Brewer received several shock therapy treatments at age 10; b) he had brain damage (apparently as a result of blows to the head as a young boy) and was classified as mentally defective; c) at age 11, Brewer was evaluated as "fixated at a very dependent and infantile level, a level of development that comes prior to any real concern or ability to control impulses, in short, self-control"; and d) at age 12 Brewer's I.Q. was rated from 58 to 67, depending on the test. Although the district court stated that Brewer "was mildly retarded having a I.Q. of 76" on the basis of a report from Dr. Vargus (a state-court appointed psychologist) submitted prior to sentencing, the record reveals that another evaluation performed by the same psychologist some 7 months later resulted in a score of 68, an I.Q. more consistent with that attributed to Brewer at age 12.
 
 
 53
 Defense counsel's failure to investigate Brewer's mental history appears even more egregious when viewed in conjunction with the testimony of the court-appointed psychologist at the hearing on the Belated Motion to Correct Errors. The psychologist testified that Brewer "was like a little sheep to people he liked or considered his friends.... He needs companionship and took [sic] it any way he could." Dr. Vargus further testified that Brewer is so easily led that while "there might be times when somebody told him to jump off a 10-story building, he might not. But if it had been a companion or a certain friend, he would most likely go along with it.... We are subject to the influence of other people. He is especially susceptible to that." (Emphasis added). If the jury had been presented with this evidence of Brewer's tendency to be influenced by others, it might well have decided that he was under the influence of Kenny Brooks during the crime spree or that Brewer was simply not the type of individual, because of his impaired mental capacity, who deserved the death sentence.
 
 
 54
 In addition to the evidence regarding Brewer's I.Q. and his propensity for being easily led, there was also evidence that could have been presented about his disadvantaged childhood that might have placed him in a more sympathetic light before the jury. Brewer's mother died when he was 12, and after that he was shuttled "from one member of the family to another." His father was 70 at the time, and demonstrated minimal interest at best in his welfare. Several months after his mother's death Brewer was returned to the Indiana Boys' School for parole violations, and it was recommended that he "not be placed under the supervision of the Gary District Office, due to the criminal and anti-Social behavior of the entire family.... [T]here is no family life--the family serves the purpose of room and board to each other, and if returned to this area any constructive assistance or treatment given him would be of no value." As one report described Brewer, he was "an emotionally needy, dependent, deprived, sad, overwhelmed, confused young lad who has little going for him socially, physically, intellectually, personality-wise or family-wise." In view of Brewer's attorney's failure to make a reasonable investigation to discover this readily available evidence regarding Brewer's low I.Q., susceptibility to the influence of friends and disadvantaged background, we hold that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S.Ct. at 2064; see Kubat, 867 F.2d at 369.
 
 
 55
 In order to justify the granting of a habeas petition, we must also conclude that Brewer was prejudiced through his attorney's deficient performance. The Indiana Supreme Court held that Brewer "was not prejudiced [by his attorney's failure to present mitigating evidence to the jury] as the major factors he desired to have considered were presented before a final determination of sentencing was made by the trial judge." Brewer II, 496 N.E.2d at 374. We are unpersuaded that the sentencing judge's consideration of the mitigating factors precludes prejudice to the defendant. In our opinion "there is a reasonable probability that [if the jury had been aware of Brewer's low I.Q. and deprived background, it] ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069. While the sentencing judge did not find the above evidence sufficiently mitigating to overcome the aggravating circumstance of the murder, there is a reasonable probability that the jury, if presented with the evidence of Brewer's entire history--troubled childhood, low I.Q., deprived background, and myriad of other psychiatric problems--might very well have felt differently. The state has failed to establish any likelihood that the sentencing judge would have refused to follow the jury's recommendation if it had recommended a sentence of years as opposed to death. Thus, we agree with the district court that the writ should issue unless the State of Indiana provides Brewer with a new sentencing hearing.
 
 B. False Alibi
 
 56
 The false alibi issue presents the anomalous and absurd situation of the government arguing, for the purpose of persuading us that Brewer received effective assistance of counsel, that the defense attorney's presentation of perjured testimony during the guilt phase of the trial was ethical, an argument that is at best questionable from the perspective of what a lawyer must do under the instruction of the Model Code of Professional Responsibility. As stated above, a defendant asserting an ineffective assistance of counsel claim must demonstrate that his attorney's representation "fell below an objective standard of reasonableness," and that "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687-88, 104 S.Ct. at 2064. The prevailing norm regarding perjured testimony in Indiana during 1978 was Disciplinary Rule 7-102 of the Model Code of Professional Responsibility, which provides:
 
 
 57
 "(A) In his representation of a client, a lawyer shall not:
 
 
 58
 * * * * * *
 
 
 59
 (4) Knowingly use perjured testimony or false evidence.
 
 
 60
 * * * * * *
 
 
 61
 (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."
 
 
 62
 The district judge held that "[b]ecause counsel knowingly called witnesses who testified falsely, this Court concludes that counsel's performance did not satisfy an objective standard of reasonableness."[2] The district court further held that if Brewer
 
 
 63
 "had not been caught in a scheme to deceive the jury [he] might well have been believable in his denial of shooting the victim since there was physical evidence at trial that corroborated his denial. However, counsel's plea for mercy on behalf of his client, proved a thief and a murderer and now admitted [sic] a liar, simply fell flat. Under these circumstances, the Court cannot say that this result would be no different without the perjured testimony. Instead there is a reasonable probability that a jury, unburdened by the perjury, might have declined to impose the death penalty and thus this Court's confidence in the penalty phase is in fact undermined by the effects of counsel's misconduct. Accordingly, on this ground, the writ should issue unless petitioner is resentenced."
 
 
 64
 We disagree. Regardless of whether the attorney knew that the alibi testimony was contrived, the entire argument over whether presenting false alibi testimony constitutes ineffective assistance of counsel is immaterial. The purpose of the rule against presenting false evidence is to protect the integrity of the truth-finding function of courts rather than the rights of the defendant. Cf. Nix v. Whiteside, 475 U.S. 157, 174, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986) (attorney's responsibility to prevent perjured testimony is a duty to the court). The rule protects the public from allowing defendants to subvert the criminal justice system through fabricating evidence. Ineffective assistance of counsel claims have validity only to the extent that the attorney has departed from a professional norm established for defending a law violator. It would be absurd to create a rule allowing a defendant to go free if perjured testimony succeeds while at the same time providing for a new trial if the witness is a poor liar. Thus, we refuse to hold that the presentation of perjured testimony at the request of the defendant is adequate to constitute ineffective assistance of counsel.
 
 
 65
 The state's peculiar and unusual position that the presentation of the false alibi was ethical is especially surprising in view of the fact that the Indiana Supreme Court specifically held that Brewer waived the false alibi argument when he failed to raise it on direct appeal and was unable to justify the failure (show cause) on collateral attack:
 
 
 66
 "Although this particular argument [that the alibi witnesses prejudiced Brewer's case] was not advanced on appeal, Petitioner has failed to indicate why he was precluded from raising it at that time. Because post-conviction relief is unavailable for issues available to Petitioner upon original appeal, Petitioner in the instant case has waived this issue. Bailey v. State (1985), Ind., 472 N.E.2d 1260, reh. denied."
 
 
 67
 Brewer II, 496 N.E.2d at 373. Thus, the argument would have been unreviewable in a habeas action if the state had raised the defense of procedural default in the district court, or perhaps even in this court. See Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (absent a showing of "cause and prejudice" a state procedural default may not be reviewed on a federal habeas corpus petition); Burgin v. Broglin, 900 F.2d 990, 997 (7th Cir.1990) (district court may raise state procedural default sua sponte ). Hence, the state's untenable position (in the face of Disciplinary Rule 7-102's prohibition of the use of perjured testimony) that the presentation of the false alibi testimony was a valid choice was entirely unnecessary.[3]
 
 IV. CONCLUSION
 
 68
 We hold that defense counsel's almost complete lack of investigation into Brewer's mental and family history and thus lack of knowledge regarding it as well as his failure to argue mitigating factors to the jury constitute ineffective assistance of counsel sufficient to undermine our confidence in the outcome of the jury's death penalty recommendation. "The defendant [has] show[n] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. The order of the district court is
 
 
 69
 AFFIRMED.
 
 
 70
 EASTERBROOK, Circuit Judge, concurring.
 
 
 71
 The court's opinion, which I join, concludes that Brewer did not receive the sort of legal assistance that was his due at the sentencing hearing. Counsel invested all his time in attempting to get Brewer off and treated sentencing as an afterthought--a blunder, because counsel should have appreciated from the beginning that there was not much chance of acquittal. Sentencing was to be the main event.
 
 
 72
 Perhaps a canny lawyer would have proceeded just as Brewer's did, trying to maximize the chances of acquittal while counting on the courts to protect his client from execution in the event of conviction. In capital cases, the best defense at sentencing may be no defense, leading to an order annulling the death sentence. Once guilt is established the options are death or extended imprisonment. The lack of a stirring defense at the sentencing phase increases the likelihood that a capital sentence will be converted to a life sentence, while an impeccable performance may doom the client to the gallows.
 
 
 73
 Deliberately sub-par performance is unethical, but some lawyers are willing to break rules to prevent capital punishment, which they view as a sin greater than any they could commit in the client's behalf. Brewer's lawyer disregarded his legal obligations in order to assist his client: the lawyer submitted perjured testimony. That maneuver backfired. Maybe the lackadaisical performance at sentencing was just another stratagem--properly treated, when discovered, as forfeiting any right to a new sentencing hearing. Indiana does not contend, however, that counsel was trying to pull this stunt, and if we take things at face value we must conclude that counsel botched the job.
 
 
 74
 Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), holds that even in a capital case the defendant must establish that his lawyer's shortcomings led to prejudice. This means "a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695, 104 S.Ct. at 2069. In Indiana the sentencer is the judge; juries recommend but do not impose sentences. Ind.Code Sec. 35-50-2-9. Indiana naturally contends that counsel's failure to present the psychological evidence to the jury was immaterial, because before imposing sentence the judge obtained the information that Brewer says his lawyer should have furnished.
 
 
 75
 The state would have a good argument, if the judge made an independent decision--if the recommendation of the jury were no different from the recommendation of the judge's law clerk. Indiana's brief depicts it so. Yet Martinez Chavez v. State, 534 N.E.2d 731, 735 (Ind.1989), holds that "to sentence a defendant to death after the jury has recommended against death, the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender and his crime. A trial court cannot override the jury's recommendation unless the facts meet this standard." In denying the petition for rehearing, the Supreme Court of Indiana rejected the argument that a judge could sentence a defendant to death if the jury's recommendation for mercy is "unreasonable". 539 N.E.2d 4 (1989). The brief filed in this court by the Attorney General of Indiana, asserting that the judge may freely reject the jury's recommendation, cites no cases.
 
 
 76
 Reasonable persons could believe death an inappropriate penalty for Brewer, so the judge could not have imposed the death sentence in the face of a contrary recommendation from the jury. That leaves only the question whether there is a "reasonable probability" that the jury would have recommended against death had it known of Brewer's limited intellect and passive personality. This is an empirical inquiry. How do juries react to such information? On the one hand, it shows the defendant to be less culpable; on the other, it shows the defendant to be less deterrable. These cut in different directions. Jurors who see capital punishment as the just desert of the wicked will be swayed in favor of lenience; jurors with more instrumental views will incline toward execution as the only way to incapacitate such a person.
 
 
 77
 Brewer's current lawyers, like those representing the state, offer up confident (and divergent) assertions about how juries respond to claims of diminished mental capacity. Neither of these incompatible beliefs has any visible means of support. Lawyers see but a few capital cases during their lifetimes. They acquire anecdotes, not data. You need to study hundreds of similar cases to learn the probable effects of presenting different kinds of evidence to juries. As it turns out, social scientists have carried out such studies--studies neither side bothered to consult, each preferring asseveration to fact.
 
 
 78
 Trying to persuade the jury that the accused is mentally ill is worse than no defense at all. Jurors distrust insanity defenses, believe that the defendants are trying to bamboozle them; if persuaded that the defendants are indeed nutty, jurors believe that death is the only sure way to prevent future crimes. Lawrence White, Juror Decision Making in the Capital Penalty Trial: An Analysis of Crimes and Defense Strategies, 11 L. & Human Behavior 113, 122-25 (1987). Accord, Project, Standardless Sentencing, 21 Stan.L.Rev. 1297, 1361-63 (1969). Drawing to the jury's attention an organic problem such as mental retardation, though, cuts the other way; jurors are more likely to credit these claims and to express sympathy. Ellsworth, Bukaty, Cowan & Thompson, The Death-Qualified Jury and the Defense of Insanity, 8 L. & Human Behavior 45 (1984). Whether such defenses actually help the accused is a close question. The Stanford study finds no effect, 21 Stan.L.Rev. at 1383, and the Ellsworth study a small one.
 
 
 79
 Brewer has an organic intelligence problem, no one doubts. His "passivity" too may have an organic source, although a jury also might think this so much psychiatric mumbo-jumbo. Presenting to the jury the congeries of facts and diagnoses laid before the judge could not have done much harm, and might have helped if Ellsworth and colleagues are right. The impetus for death may have been so strong that Brewer had little to lose. I therefore agree with my colleagues that there is a "reasonable probability" that the jury would have recommended against death had it known of Brewer's limited intellect and passive personality. Indiana might have been able to make a contrary showing by analyzing the results of defenses presented to Indiana juries. It did not try; as I have emphasized, the prosecutors thought that they could rescue this sentence by thumping on the table and hoping that our gestalt would match theirs. Intuition is a poor substitute for data. Before sending a man to his death a state should have more regard for both law and fact than Indiana has shown.
 
 
 
 *
 Since this appeal was filed, James E. Aiken has succeeded John T. Shettle as Commissioner, Indiana Department of Corrections, and G. Michael Broglin has succeeded Norman Hunt as Director, Diagnostic Center, Plainfield, Indiana. We have substituted Mr. Aiken's name for Mr. Shettle's and Mr. Broglin's name for Mr. Hunt. See Fed.R.App.P. 43(c)(1)
 
 
 [1]
 At a hearing on a Belated Motion to Correct Errors filed in the state court by appellate counsel, Dennis Kramer, defense counsel testified that he spent 150 to 200 hours preparing for the guilt phase, but his preparation for the penalty phase consisted of only "a couple of hours of discussion with Mr. Brewer."
 
 
 [2]
 The government argues that this holding of the district court fails to give adequate deference to the Indiana Supreme Court's holding that the "attorney did not know which version [of the events surrounding the murder Brewer] had given him was the truth." Brewer II, 496 N.E.2d at 373. In view of our disposition of this issue, it is unnecessary for us to determine whether the Indiana Supreme Court's finding was "fairly supported by the record" as required for deference under 28 U.S.C. Sec. 2254(d)(8)
 
 
 [3]
 It is surprising that during oral argument the attorney for the State of Indiana insisted on pursuing the argument that the defense attorney's conduct was ethical even after we clearly pointed out that the unethical act of presenting false evidence fails to constitute ineffective assistance of counsel